623 A.2d 666

Mark A. BISCOE, et al.

v.

**BALTIMORE CITY POLICE DEPARTMENT, et al.**

Sharon A. SHECKELLS

v.

**BALTIMORE CITY POLICE DEPARTMENT, et al.**

**Nos. 28, 1397 and 1398, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 28, 1993.

Certiorari Denied June 25, 1993.

Michael Marshall (Schlachman, Belsky & Weiner, P.A., on the brief), Baltimore, for appellants.

Gary C. May, Sp. Asst. Sol. (Michael A. Fry, Asst. Sol. on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., and DAVIS and GETTY (James S., Retired, specially assigned), JJ.

WILNER, Chief Judge.

These consolidated appeals arise from the dismissal of two Baltimore City police officers, Mark Biscoe and Sharon Sheckells, for "unsatisfactory performance." Three appeals are now before us—one from a summary judgment entered by the Circuit Court for Baltimore City denying appellants' prehearing request to enjoin the Police Department from proceeding with the dismissal actions, and one each from the affirmance by that court of the Police Commissioner's orders, entered upon the recommendation of a disciplinary hearing board, dismissing the two officers.

## I. *Introduction*

Although a number of specific issues are raised in these appeals, essentially the appeals arise from a conflict between two independent policies relating to police officers who are injured to the point that they can no longer perform the duties of their job. One policy is expressed in the retirement laws governing such officers—in particular art. 22, § 34 of the Baltimore City Code; the other emanates from General Orders of the Police Commissioner dealing with medical leave and the need to have authorized positions in the Police Department filled with individuals capable of adequately discharging the duties of those positions. Each policy has a different focus and each is entirely reasonable in its own right. When they clash, however, as they do in these cases, they can create an unacceptable unfairness to police officers, to the point that one of the policies must yield to the other.

Both the potential for conflict and actual conflict, when it occurs, proceed directly from the fact that the two policies are administered by different entities, without any required coordination between them.

## A. *Retirement Policy*

Art. 22, §§ 30–45 create a retirement system for fire and police employees in Baltimore City. The system is generally

administered by a nine-person Board of Trustees, but the final administrative decision as to whether an employee is eligible for a disability retirement is made by a hearing examiner selected from a panel of examiners appointed by the City Board of Estimates. *See* § 33.

In addition to normal service retirement after 25 years of service or attaining age 50, the law provides two kinds of disability retirement—ordinary disability retirement, described in § 34(c), and special disability retirement, described in § 34(e). The special disability retirement provides greater benefits but is available only if the disability results from an injury arising out of and in the course of the actual performance of duty. We are concerned here with § 34(e), which states:

"Any member who has been determined by the hearing examiner to be totally and permanently incapacitated for the further performance of the duties of his job classification in the employ of Baltimore City, as the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on his part, shall be retired by the Board of Trustees on a special disability retirement."

As noted, the decision as to whether an employee is entitled to such retirement is made by a hearing examiner, whose decision, favorable or unfavorable, may be appealed to the Circuit Court for Baltimore City and thence to this Court. § 33. If a person who has been granted a special disability retirement is later found to have become "fit to resume duties in the classification in which he was performing duties at the time of his retirement," he or she may be restored to active service. § 34(g). The law is not clear as to whether the agency is required to accept the employee back. It does provide that, until such time as the retiree "is actually reemployed he shall continue to receive his disability retirement allowance," but that if, after being certified as fit, he or she "refuse[s] to accept an offer of reemployment ... in the classification in which he was performing duties at the time of his retirement ... all rights in and to his pension shall be

revoked by the Board of Trustees, upon recommendation made by the Panel of Hearing Examiners." *Id.*

This law was recently construed by the Court of Appeals in *City of Baltimore v. Hackley*, 300 Md. 277, 477 A.2d 1174 (1984). The question there was whether police officers found by a hearing examiner to be " 'mentally or physically incapacitated for the further performance of the duties of [their] job classification' " were " 'totally and permanently incapacitated for the further performance of the duties of [their] job classification' " when they were capable of performing "some, but not all, of the duties of their job." *Id.* at 279, 477 A.2d 1174. The more specific question was whether there was a different standard in this regard between an "ordinary" disability retirement under § 34(c) and the "special" disability retirement under § 34(e). The Court concluded that there was not—that the standard in both cases was total and permanent incapacity—but found itself unable to resolve the broader question on the record before it. It therefore remanded the case for further consideration of "the proper definition of incapacitated." *Id.* at 290, 477 A.2d 1174. In that regard, it directed that several questions be answered:

> "For example, is it in fact a practice of the Baltimore City Police Department to assign personnel to regular, permanent, full-time, light duty jobs which are within the job classification of police officer? Have the police officers assigned to such positions in the past been those with physical limitations, those who are completely physically fit, or both? Is each claimant in the cases before us assigned to such a position? Finally, is each claimant able to perform the duties of the position to which he has been assigned?"

*Id.*

Those questions were answered on remand. A hearing examiner determined that it was the practice of the Police Department to assign personnel to "regular, permanent, *full-time* light duty jobs" (emphasis added) and that the light duties assigned to the officers in question were " 'within the job classification of police officers.' " *Hackley v. City of Baltimore*, 70 Md.App. 111, 116–17, 519 A.2d 1354 (1987).

Because the officers were assigned to such light duties and were found able to perform them, the examiner concluded that they were not totally and permanently incapacitated for purposes of § 34(e) and thus, once again, denied a special disability retirement. We affirmed.

By virtue of the two *Hackley* cases, it seems clear that an officer who is assigned to a light duty position with the Department and who is capable of performing the duties of that position is not "totally and permanently incapacitated for the further performance of the duties of his job classification" and is therefore not entitled to either an ordinary disability retirement under § 34(c) or a special disability retirement under § 34(e). It is also apparent that such light duty positions are full-time, not part-time, positions, requiring that the officer work a full shift five days a week.

### B. *Medical Leave Policy—Non–Performance of Assigned Duties*

The other policy affecting injured officers emanates from General Orders 15–87 and 2–88, issued by the Police Commissioner pursuant to his statutory authority to adopt rules and regulations "as may be necessary for the good government of the Department and of its members." Code of Public Local Laws of Baltimore City, § 16–7(8) (1980). General Order 15–87 sets forth the Department's medical program. One part of it, contained in Annex A to the General Order, states, in relevant part:

"Baltimore Police Department employees are provided sick leave benefits in keeping with the following:

1. Under the direction of the Chief Police Physician all sworn personnel are entitled to sick leave as may be required to recover from illnesses/injuries."

General Order 2–88 contains the general rules and regulations governing the Department. Rule 1 deals with conduct of Departmental employees, and § 19 of that Rule provides, in relevant part, that members of the Department "shall be held strictly responsible for the proper performance of their duties," that unsatisfactory performance may be demonstrated

by "an unwillingness or inability to perform assigned tasks," and that the following would also be considered *prima facie* evidence of unsatisfactory performance: "[r]epeated inability to perform assigned duties in a satisfactory manner due to physical, mental, or emotional incapacitation" and "repeated inability to perform assigned duties in a satisfactory manner due to physical infirmity or mental/emotional incapacitation."

Section 16–11(a) of the City's Public Local Laws makes clear that a police officer who has completed his or her probationary period and who does not otherwise serve at the pleasure of the Commissioner may be dismissed "only for cause, in accordance with rules, regulations, or orders to be prescribed by the Commissioner." Section 16–11(b) affords an officer against whom charges have been filed the right to a hearing before a disciplinary hearing board. The Commissioner may then (1) review the findings and conclusions of such a board and affirm, reverse, or modify its decision (§ 16–11(d)), and (2) "impose such punishment as shall be deemed appropriate under the circumstances, including . . . dismissal" (§ 16–11(c)).

One of the issues raised in this appeal, and that we shall hereafter address, is the relationship between the two General Orders noted above. The Department's position is that, if an officer is sufficiently incapacitated to be unable, repeatedly, to perform his or her assigned duties, the officer, after a hearing before a disciplinary board, may be discharged for unsatisfactory performance.

The issue, which this long preface introduces, is whether an officer may be dismissed for unsatisfactory performance upon a finding by a disciplinary board that the officer is unable by reason of physical incapacity to perform his or her assigned duties when an examiner acting under art. 22, § 34 has concluded that the officer is *not* totally and permanently incapacitated for the further performance of the duties of his or her job and, for that reason, is not entitled to a disability retirement. What happens, in other words, when the examiner declares that the officer is not so incapacitated as to be eligible for retirement because he or she can perform light

duty and the disciplinary board declares that the officer has been unable to perform those duties by reason of injuries sustained in the line of duty? That is essentially what occurred in these cases.

## II. *Procedural History*

On September 10, 1991, the Personnel Division of the City Police Department filed separate charges against Officers Biscoe and Sheckells, charging each with a violation of General Order 2–88, Rule 1, § 19. The specification asserted against Officer Biscoe was that, commencing with his entry on duty as a cadet in 1980 and continuously thereafter, he "has made excessive use of medical leave resulting in his having been unavailable for the assignment of any duties at those times thereby demonstrating unsatisfactory performance." Almost precisely the same specification was asserted against Officer Sheckells, except that it covered the period commencing March 28, 1988.

It is important at this point to stress that neither officer was charged with taking any medical leave to which he or she was not entitled. General Order 15–87 which, as noted, sets forth the Department's medical leave policy, carefully distinguishes between "Medical Abuse," which it defines as "[a] deceitful or deceptive use of medical leave ... not necessitated by verified illness or injury," and "Excessive Medical Leave," which it defines, in relevant part, as "[a] condition in which more than normal, reasonable, or expected leave is utilized, either for verified medical problems or through flagrant abuse of medical leave privilege." At no point did the Department charge either officer with Medical Abuse. Nor was there any evidence that either officer, from and after their respective line-of-duty accidents, *could* have worked days or hours for which they took leave. The thrust of the charges was that the officers, due to their respective disabilities, were unable to perform their assigned tasks—Sheckells was unable to work more than four or five hours a day and Biscoe was unable to work a five-day week. The medical leave was thus "excessive" in relation to the number of hours required to be worked, not

in relation to the nature or extent of their respective disabilities. The problem, as explained at oral argument, was simply that the officers were repeatedly unavailable to work the required number of hours and days, even in the light duty positions to which they were assigned.

In each case, a hearing before a disciplinary board was scheduled for late October, 1991. Taking the offensive, the two officers filed a complaint in the Circuit Court for Baltimore City on October 21, 1991, seeking to enjoin the Department from proceeding with the prosecution of those charges. Three grounds were asserted in the complaint for such an injunction: (1) that Departmental General Order 15–87 allows police officers unlimited medical leave, that that Order constituted a contract between the Department and the officers, and that the prosecution of the charges preferred against the officers would constitute a breach of that contract; (2) that prosecution of the charges would also constitute an unlawful attempt to evade the special disability retirement provisions of Baltimore City Code, art. 22, § 34(e); and (3) that prosecution would violate Md.Ann.Code art. 27, § 730(b)—part of the Law Enforcement Officers Bill of Rights (LEOBR)—because it was commenced more than one year after the charges "came to the attention of the Department."

The administrative hearings were deferred pending resolution of the court action. On November 14, 1991, the court, in a brief order, granted the Department's motions for summary judgment and denied appellants' cross motions. An appeal was noted from the judgments, but it was stayed pending the administrative proceedings.

The two officers then filed an action in the United States District Court alleging that the impending administrative proceeding would violate their rights under the Rehabilitation Act of 1973 (29 U.S.C. § 794) as well as under 42 U.S.C. § 1983. The thrust of the Federal action, as characterized by Judge Smalkin in granting summary judgment to the Department, was the assertion that the Department "is obliged not to discipline them for excessive use of sick leave, but, rather, to accommodate them by assigning them to limited duty jobs

that would be compatible with their physical conditions." Judge Smalkin viewed the Federal action as arising "from the same transaction or core of operative facts" as the State action and thus entered summary judgment for the defendants based on *res judicata*, declaring that appellants had "simply conceived of additional theories of law supporting [their] quest for relief from the ongoing disciplinary proceedings" and that "[n]ew legal theories will not suffice to relieve the bar of claim preclusion." The defendants' judgments were entered by the District Court on January 23, 1992. Appellants appealed to the U.S. Court of Appeals for the Fourth Circuit but later, in March, 1992, dismissed that appeal.

The administrative proceedings commenced in December, 1991—before completion of the Federal action. In each case, the officer attempted to raise before the disciplinary board, through a motion to dismiss the proceeding, the breach of contract issue rejected by the circuit court in the injunction proceeding and the Rehabilitation Act complaint made in the Federal case. Those motions were denied and the disciplinary board proceeded to hear evidence on the merits of the charge. At the conclusion of the hearing, in each instance, the board recommended that the officer be dismissed, and, in each instance, the Police Commissioner concurred and dismissed the officer. The officers appealed those decisions to the circuit court which, on July 21, 1992, affirmed.

### A. *Facts Regarding Officer Biscoe*

Biscoe joined the Department as a cadet in March, 1980. He completed the police academy in January, 1981. As of November 1, 1991, he had used a total of 556.5 days of sick leave, for a yearly average of 56 days per year. One hundred and fifty of those days were taken in the years 1980–87, and nearly all of them were for injuries or illnesses not contracted in the line of duty. Biscoe took 100 days in 1989, of which 80 were regarded as line of duty, 200 days in 1990, of which 197 were classed as line of duty, and 61 in 1991, of which 52 were declared line of duty. Concern about his use of medical leave first surfaced in 1984, when, on March 8 of that year, his

commander wrote to the Department's chief physician indicating that Biscoe was counseled "to make an attempt to reduce the number of medical days taken" and that his medical records would be closely monitored. In the officer's 1984 evaluation report, his supervisor called attention to the medical record, saying that "[t]his has created a problem with me not being able to depend on his availability for work." Biscoe was again counseled in 1985, when he took 21 days of medical leave.

In February, 1986, the Chief Physician again became involved. At that time, Biscoe had taken an average of 17.8 days per year medical leave, against a departmental average of 7.5 days per year. Of the 107 days, 84 were attributed to "common illnesses" such as flu and 98 days were for illnesses not in the line of duty; only nine days were attributed to injury received in the line of duty. On March 12, Biscoe was examined and found to have no chronic illness precluding the performance of full duty. Nonetheless, he took 24 days medical leave in 1986. The same pattern repeated in 1987, when he took another 29 days. After reviewing his medical record to date, the Chief Physician indicated that Biscoe had taken 90 days for viruses and colds, 16 days for injuries not in the line of duty, and only 14 days for line-of-duty injuries. He observed that the officer appeared to be "accident prone" and to suffer "repeatedly from common colds and other respiratory illnesses." Despite this pattern of using greater-than-average medical leave, no disciplinary action was taken against Officer Biscoe.

On March 26, 1988, Biscoe was involved in a line-of-duty traffic accident when his patrol car was struck by a drunk driver. As a result of the accident, he developed degenerative arthritis in his right ankle, for which he underwent surgery in June, 1989. He claimed to be unable to drive or to walk on hard surfaces. His performance evaluation for the period January 1, 1989 to June 30, 1989—during which period he used a total of 26 medical leave days—noted that Biscoe's medical problems were creating a morale problem in the

squad because other officers had been unable to receive leave due to Biscoe's unavailability.

In April, 1990, Biscoe's commander submitted a request that Biscoe be assigned to light duties. That request was granted, and he was assigned to work in the Central Records Division. He worked five days and then went on medical leave for nine months. A footnote in the request averred that both Dr. Barranco (the Chief Police Physician) and Biscoe's personal physician agreed that he was "not likely to return to full duty." Interestingly, on January 29, 1991, Biscoe submitted a request for secondary employment in sales management for the financial services company, "Primerica." The request was granted the following day.

In August, 1990, Biscoe applied for a special disability retirement pursuant to art. 22, § 29–41A of the Baltimore City Code. His petition was denied in January, 1991, the examiner concluding that:

> "The Claimant does have degenerative arthritis of the right ankle which limits his ability to perform prolonged standing or walking on a persistent and regular basis. However, the Hearing Examiner finds that the Claimant's former duties as a Warrant Officer did not require extensive walking and standing on a regular basis."

On April 22, 1991, a memorandum was sent to Biscoe from the Director of Personnel advising him that his medical leave significantly exceeded the average. The memorandum further stated that "[b]y this notification you are advised that immediate improvement is necessary in this regard and that your continued use of medical leave at similar rates may lead to administrative action in your case." Biscoe's attorney responded to the memorandum, indicating that the officer would cooperate to the best of his ability and requesting that the Department have patience with Biscoe's situation. Between then and November 1, 1991, Biscoe used an additional 29 days of medical leave; in the first six months of 1991, Biscoe took a total of 47.5 medical leave days. On August 7, 1991, the Personnel Division requested that the Deputy Commissioner

of the Administrative Bureau take disciplinary action against Biscoe.

## B. *Facts Regarding Officer Sheckells*

Officer Sheckells commenced employment with the Department in October, 1980. From 1981 through November, 1991, she used a total of 943 medical leave days, the vast majority of which were line-of-duty related and taken in 1988 (212 days), 1989 (261 days), 1990 (261 days), and 1991 (95 days). This resulted from a back injury sustained on February 5, 1988 while in pursuit of a suspect. She reported a pulled muscle on February 8, but was required to undergo surgery in March, 1988 (bilateral lumbar laminectomies with foraminotomies and excision of herniated disc at L4/L5) and August, 1989 (hemilaminectomy, diskectomy, and bilateral posterior fusion, L4/L5). She went on medical leave on March 28, 1988 and remained on such leave for 767 days, until February 15, 1991. In February, 1989, Dr. Barranco, the Chief Police Physician, reported to the Deputy Commissioner that Officer Sheckells had been examined by five police physicians and recommended her for retirement, opining that "it is doubtful that she will be able to do police duties again."

Upon Dr. Barranco's recommendation, Officer Sheckells applied for a special disability retirement in June, 1990. In November, 1990, a hearing examiner denied the request on the ground that Officer Sheckells was capable of performing light duty positions. The officer appealed that decision.

On January 21, 1991, while her appeal was pending, the Director of the Personnel Division informed Officer Sheckells that her medical leave situation "constitutes unsatisfactory performance" and that unless she returned to productive employment in the near future, disciplinary proceedings might be instituted. A month later, she returned to limited duty at the Northeastern District, but, after complaining that she was unable to perform those duties because they involved crawling and climbing ladders, she was transferred to perform clerical duties in the Personnel Division. She was removed from that position when her doctor restricted her work to four hours a

day. In her evaluation for the period January–June, 1991, her value to the Department was rated as "unsatisfactory because of her special disabilities." Following that evaluation, Dr. Barranco again reviewed her medical record and concluded that "her progress will be basically nil and the prognosis for either progression of duration or intensity of work is very poor at this time."

At some point, the circuit court remanded the disability case for the hearing examiner to determine whether Officer Sheckells could perform the duties of specific light duty positions currently existing in the Department. Once again, the examiner rejected her request. On September 6, 1991, he concluded that she was "capable of performing light work for eight hours per work day with restrictions consisting of no extensive sitting or standing in one position" and that "[b]ending, climbing and crawling should be restricted in a common sense fashion." The examiner noted that Officer Sheckells had taken a three-week cruise in May/June, 1991 and found her testimony regarding her physical limitations "exaggerated and . . . designed to present her physical limitations in a manner to obtain disability benefits."

On the evidence received, the disciplinary board recommended dismissal and, as noted, the circuit court affirmed that dismissal. We are informed by the parties that, at some point after the conclusion of the circuit court proceedings, the circuit court reversed the hearing examiner's decision denying a special disability retirement on the ground that there was no substantial evidence to support it and that, as a result, she ultimately received the special disability retirement.

### III. *Issues and Discussion*

Appellants raise before us a combination of some of the issues that they raised in the injunction proceeding, in the Federal action, and before the disciplinary boards—whether under Departmental General Order 15–87 and a collective bargaining agreement with the City, they are entitled as a matter of contract to unlimited medical leave, whether their termination for excessive use of medical leave contravenes the

special disability retirement provision of City Code, art. 22, § 34(e), whether it abridges their rights under the Rehabilitation Act, and whether they received proper notice of the charges. The Department responds that some of these claims are barred by *res judicata* and that the balance are without merit.

## A. *Breach of Contract*

■ Appellants contend that they have a contractual right to unlimited medical leave and that they therefore cannot legitimately be dismissed for using such leave—that there is, in other words, no such thing as "excessive" medical leave. They base that argument on two sources—General Order 15–87 and a collective bargaining agreement.

General Order 15–87, as noted earlier, provides that "[u]nder the direction of the Chief Police Physician all sworn personnel are entitled to sick leave as may be required to recover from illnesses/injuries." This provision, they contend, entitles them to unlimited and unqualified medical leave. That is not so. It entitles them to such leave as may be required to recover from their injuries. The evidence indicates that they had long ago reached their maximum recovery; they are not still recuperating. Their inability to work a normal work week results from what they contend, and what appears to be, a permanent disability, not a healing process. General Order 15–87 does not address "sick leave" necessitated by a post-recovery disability.

■ The part of the collective bargaining agreement relied upon is art. 28, dealing with medical leave policy. We see nothing in that article providing unlimited medical leave. Moreover, we note that the article expressly states that "[n]othing in this Policy shall be construed to prevent the Police Commissioner from taking formal disciplinary action for violation of the policies of the Department."

In summary, we conclude that the officers do not have a contractual right to unlimited and unqualified medical leave.

### B. *Rehabilitation Act*

29 U.S.C. § 794(a) provides, in pertinent part, that no otherwise qualified person with a handicap may, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. Appellants contend that, in dismissing them, the Department, which they contend (and we shall assume) receives Federal financial assistance, violated § 794(a) by discriminating against them or excluding them because of a physical handicap. The Department responds, in part, with the argument that this claim is barred by *res judicata.*

As noted, prior to the commencement of the administrative proceedings, appellants sought injunctive relief in the Circuit Court for Baltimore City, contending that the Department's effort to dismiss them would not only constitute a breach of contract but would also violate the City Code and the LEOBR. They could have, but did not, add the claim now made here— that such action would also violate the Rehabilitation Act. They did make that claim in the Federal action, but the District Court declined to rule on it because it could have been raised and litigated in the Circuit Court action. The Federal Court thus applied *res judicata* in rendering its judgment.

Because we have before us a direct appeal from the Circuit Court's judgment in the injunction case, the issue of *res judicata* does not arise with respect to that appeal. What *does* preclude consideration of the issue in that appeal is Md. Rule 8-131—ordinarily, we will not consider an issue not raised in or decided by the circuit court. We see no reason to make an exception in this case. The Rehabilitation Act issue *was* raised in the disciplinary proceeding and in the action for judicial review of the dismissal orders, however, and so it is before us in those appeals.

The Department's principal defense to the claim is that it was not properly before the disciplinary board, or the Circuit Court in the judicial review proceeding. We agree,

although not necessarily for the reason given by the Department.

The Department's argument is that the claim is based exclusively on 29 U.S.C. § 794(a), and not on any other Federal or State law or policy. In 1978, Congress enacted § 794a to title 29, subsection (a)(2) of which provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance ... under section 794 of this title." The reference, in terms of the Federal Code, is to 42 U.S.C. §§ 2000e—2000e-17. Section 2000e-5 vests jurisdiction in the Equal Employment Opportunity Commission and the State counterpart, the Human Relations Commission, to redress grievances. See also Md.Code, art. 49B, §§ 7, 16, and 9A-12. The argument, then, is that the remedies available under these statutes, if not exclusive, are at least ones that must be exhausted before seeking relief from a disciplinary board. *Compare*, however, *Md.–Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 511 A.2d 1079 (1986).

We need not determine whether this is so, for there is another reason why the Circuit Court, on review of the hearing board's decisions, did not err in rejecting appellants' claims under the Rehabilitation Act. As noted, the District Court declined to address the Rehabilitation Act issue on the ground of *res judicata,* concluding that that issue could and should have been raised in the Circuit Court action. On that precise issue, whether the failure to assert the Rehabilitation Act in the Circuit Court action precluded consideration of it in a subsequent proceeding, the District Court judgment was a judgment on the merits. Appellants appealed to the Fourth Circuit Court of Appeals but later dismissed the appeal, leaving the District Court judgment intact and undisturbed. That judgment, of the District Court, is what constitutes the basis of issue preclusion. Although the District Court judgment had not been rendered when the disciplinary boards acted, both it and appellants' dismissal of their appeal to the

Fourth Circuit Court of Appeals had occurred before the Circuit Court acted in the judicial review proceeding.

■ For collateral estoppel, or issue preclusion, to apply, four requirements must be satisfied: "(1) the identity of the parties, (2) the actual litigation of an issue of fact or law, (3) the essentialness of the determination to the judgment and (4) the appealability of that determination by the party against whom the issue preclusion is being asserted." *Cassidy v. Board of Education*, 316 Md. 50, 62, 557 A.2d 227 (1989), citing *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 549, 555 A.2d 502 (1989). Here, the parties before the District Court and Circuit Court reviewing the decisions of the disciplinary boards and the Police Commissioner were identical. The District Court judgment was a final appealable judgment on the merits. Its determination that *res judicata* barred further litigation of a claim under the Rehabilitation Act is therefore entitled to preclusive effect. If that determination was incorrect—if the officers' failure to raise the claim in the State court injunction action did not suffice to preclude its litigation in a subsequent proceeding—they could have pressed for a reversal of the District Court's ruling in their appeal to the U.S. Court of Appeals. Having let that decision stand, however, they are now bound by it.

For the reasons previously outlined, we conclude that appellants were barred by collateral estoppel from raising the Rehabilitation Act issue before the disciplinary boards and that therefore the Circuit Court did not err when it rejected that claim on appeal.

### C. *Adequacy of Notice*

■ Penultimately, appellants complain that their right to due process of law was violated because they were not given adequate notice of "what specifically constituted excessive use of medical leave." We find no merit at all to that complaint. For one thing, we are unable to find that either appellant raised that issue before the disciplinary board. It clearly was not raised in their complaint for injunctive relief. The issue, therefore, has not been preserved for appellate review.

#### D. *Special Disability Retirement Law*

We turn, finally, to the issue raised in Part I of this Opinion—the clash between General Order 2–88 and art. 22, § 34(e). In Officer Sheckells' case, the circuit court, on review of the examiner's decision rejecting her application for retirement, has determined that, as of the time the disciplinary board acted, she was totally and permanently incapacitated for the further performance of the duties of her job classification, including, under *Hackley,* whatever light duty was available to her. She has, accordingly, been awarded a special disability retirement. We realize that that determination was made through another process and that, when the disciplinary board acted, that determination had not yet been made. Nonetheless, it would be anomalous, at best, to have Officer Sheckells subjected to such a flagrant inconsistency—retired because of a total and permanent incapacity legitimately flowing from a line-of-duty injury, and discharged for "unsatisfactory performance" for precisely the same reason.

Officer Biscoe presents a different case, but it leads to an equivalent contradiction. In one respect, his case seems much less compelling because of his consistent pattern of taking medical leave for rather trivial reasons throughout his career, but the fact is that that was not the basis of his dismissal. His dismissal rested on his inability to work full time, even on light duty, because of the injuries he sustained in the 1988 accident. Another difference, of course, is that, unlike Officer Sheckells, Biscoe was *not* given a special (or ordinary) disability retirement. That does not eliminate the conflict, however, but actually makes it more dramatic. Biscoe has been told by the examiner that he *can* do light duty work on a full-time basis, which is why he was denied the retirement. He has been told by a disciplinary board that his performance is unsatisfactory because he *cannot* do light duty work on a full-time basis. One of those conclusions is wrong.

The first Justice Marshall instructed us in *Marbury v. Madison,* 5 U.S. 137, 2 L.Ed. 60 (1803), that, when faced with a clash of laws, one of Constitutional origin and one merely statutory, a court must give precedence to and apply the

higher law. That applies as well when the clash is between a legislative enactment and an administrative regulation not directly authorized by a law superseding the enactment. The enactment, representing the will of a legislative body, prevails. Here, the contradiction is between a provision of the Baltimore City Code—an ordinance enacted by the Mayor and City Council—and a general order of the Police Commissioner. Both are valid, but, when they come into direct conflict, one must yield to the other. It is the general order that must yield.

In a duly enacted ordinance, the City has expressed its public policy that, when a police officer is totally and permanently incapacitated for the further performance of the duties of the officer's job classification, he or she shall be retired, either under § 34(c) or § 34(e), depending on whether the disability is job related. If an officer claiming such incapacity applies for retirement and is rejected upon a finding that he or she *can* perform the duties of an available position, the Police Commissioner cannot dismiss the officer upon a finding that the officer *cannot* perform those duties. A dismissal, or other discipline, would, of course, be permissible upon a finding that the officer can, but simply refuses to, perform those duties, but that is not what occurred here.

We recognize the dilemma in which the Police Commissioner may find himself when officers who apply for retirement are denied it, but that is a dilemma caused by the City ordinance and the lack of any required coordination between the retirement procedures and the disciplinary rules and procedures. It is a correctable problem.

On this record, we conclude that the court erred in affirming the orders of the Police Commissioner.

JUDGMENT IN NO. 28 AFFIRMED; JUDGMENTS IN NOS. 1397 AND 1398 REVERSED AND THOSE CASES REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT REVERSING ORDERS OF POLICE COMMISSIONER; APPELLEES TO PAY THE COSTS.