701 A.2d 1208

**Angela MURPHY**

v.

**BALTIMORE COUNTY, Maryland.**

No. 42, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Nov. 3, 1997.

Michael Marshall (Schlachman, Belsky & Weiner, P.A., on the brief), Baltimore, for Appellant.

Jeffrey Grant Cook, Asst. County Atty. (Virginia W. Barnhart, County Atty., on the brief), Towson, for Appellee.

Argued before WENNER, HOLLANDER and SALMON, JJ.

SALMON, Judge.

Angela Murphy ("Murphy"), a Baltimore County police officer, was fired from her job on September 1, 1993, for an "[i]nability to perform the duties and functions of a Police Officer for medical reasons which cannot be accommodated." After filing two earlier petitions, Murphy, on August 6, 1996, filed a second amended petition for writ of mandamus requesting, *inter alia,* that she be reinstated as a Baltimore County police officer and that she be awarded damages for a denial of due process. Appellee, Baltimore County, filed a motion to dismiss that was granted by the Circuit Court for Baltimore County on October 16, 1996.

Murphy filed a timely appeal presenting two questions:

1. If a police officer is denied a disability retirement, is the police department precluded from dismissing that offi-

cer because she is physically unable to perform her full police duties?

2. Is a police officer denied her property right in continued employment without due process of law when that officer is terminated without a pre-termination hearing or post-termination hearing shortly after her termination?

Our answers to both questions are, "Not necessarily," and for reasons explained below, we shall affirm the judgment of the circuit court.

## I. *BACKGROUND FACTS*

Most of the facts set forth in Section I are based on histories provided by Murphy to health care providers who examined her and thereafter wrote reports that were filed in the record in this case. Because of the number of reports and the detailed histories that appellant provided, we have attempted only a brief summary—yet one that will be inclusive enough to understand the legal arguments presented.

In February 1988, at age 22, Murphy, an African–American, joined the Baltimore County Police Department. She served five tumultuous years as a police officer. Murphy claims that she was permanently mentally disabled due to having been the victim of racism and discriminatory treatment by her police department supervisors, particularly by one supervisor, Sergeant McGee. During a performance evaluation, McGee, according to Murphy, "tackled" her. She sustained injuries to her arm as a result of this attack.[1]

In addition to this physical attack, Murphy claims that fellow police officers directed racially derogatory remarks at her and she was otherwise systematically harassed. When she filed complaints about her treatment, she was labeled a "complainer." Murphy was told that there were no problems before she came to the precinct and that she tried to make everything a "black/white issue." Because of perceived racial

---

1. An investigation by the police department cleared Sgt. McGee of the charges lodged by Murphy.

tensions, she became increasingly agitated in 1992 after white Los Angeles police officers, who were accused of wrongfully beating Rodney King, were acquitted of state criminal charges.

Murphy was described by her doctors as "a hostile, angry young woman," who admitted that she had problems dealing with the public and following orders. For instance, Murphy admitted that she often ignored supervisors if she felt that their demands were "unimportant." She was hostile to and denigrated fellow African–American police officers by characterizing them as "house niggas." Similarly, she admitted to "cussing out" citizens who called the police hotline with "stupid ass questions." In sum, according to reports submitted by Murphy's treating doctors, she had difficulty getting along with either white or African–American co-workers due to her mental condition.

Murphy " 'regrets' that she has not 'blown away' [certain] members of the Police Department" and has said that she understands why postal workers have resorted to violence. She reported to one of her doctors that "she was not entertaining such an idea but could understand how sweet a feeling it would be—even for just a moment—to get even." Her greatest regret was that her nemesis, Sgt. McGee, retired before she could get even with him.

According to appellant, her treatment by the police department caused a "mental condition [that] prevented [her] from performing the tasks required of a police officer, even one filling a light-duty position [like telephone duty]." Murphy's "mental condition" manifested itself in the form of depression, nervousness, insomnia, and stomach problems that had her "eating Mylanta like candy." She began seeing psychiatrists and was admitted to the Baltimore County General Hospital with pancreatitis, which, according to Murphy, was "related to the high level of stress she was encountering."

Hence, on February 6, 1993, Murphy applied to the Baltimore County Employees' Retirement System Board of Trustees for line-of-duty disability retirement benefits, alleging job-

related stress injuries. The applicable Baltimore County regulation requires that:

Upon the application of a member in service or of the employer, any member who has been totally and *permanently* incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, without willful negligence on his part, shall be retired by the board of trustees; provided that the medical board shall certify that such member is mentally or physically incapacitated for the further performance of duty, that such incapacity *is likely to be permanent,* and that such member should be retired. . . .

Baltimore County Code § 23–55 (emphasis added).

The Board of Trustees reviewed Murphy's petition and, in August of 1993, found that she *was* mentally or physically disabled for the further performance of duty but nevertheless denied her request for a pension because Murphy had failed to prove that her disability was likely to be permanent. Shortly thereafter Murphy was terminated by the police department because of her "[i]nability to perform the duties and functions of a Police Officer for medical reasons which cannot be accommodated." Murphy, on November 27, 1993, objected to her discharge by requesting a hearing before the Personnel Salary and Advisory Board (PSAB). The PSAB held a hearing on May 6, 1994, and on June 6, 1994, denied Murphy's request for reinstatement. Appellant appealed the Board of Trustees' decision to the Baltimore County Board of Appeals. The Appeals Board affirmed the decision of the Board of Trustees on March 24, 1994.

## II. *DISCUSSION*

### A. Issue I—*The Applicability of* Biscoe

■ Citing *Biscoe v. Baltimore City Police Dept.,* 96 Md. App. 1, 623 A.2d 666, (1993), appellant argues that "[t]he law in Maryland states that a police officer denied retirement benefits on the ground that he or she is not permanently

incapacitated for the further performance of his or her duties, may not be terminated for an inability to perform those duties because of the incapacity." This was not our holding in *Biscoe*. We held in *Biscoe* that "[i]f an officer claiming [an] incapacity applies for retirement and is rejected upon a finding that he or she *can* perform the duties of an available position, the Police Commissioner cannot dismiss the officer upon a finding that the officer *cannot* perform those duties." *Biscoe*, 96 Md.App. at 22, 623 A.2d 666.

■ Thus, the contradictory findings that existed in *Biscoe* did not concern the "permanence" of Biscoe's injuries. Instead, the contradiction existed because, on the one hand, Biscoe was told by the Board that he *could* perform his duties and, on the other hand, he was told by the police department that he *could not* perform them. That issue does not present itself in the case *sub judice*. A review of the facts in *Biscoe* will make appellant's misinterpretation of the case apparent.[2]

Officer Biscoe completed police academy training in January 1981. By November 1991 he had used over 550 "sick days," the bulk of which were taken after March 1988 when Biscoe was involved in a line-of-duty accident. In April 1990, Biscoe was assigned to "light duties" as a warrant officer in the Central Records Division where he worked for five days before taking a nine month medical leave. During his medical leave, in August of 1990, Biscoe filed a petition for a disability pension as provided for in Baltimore City Code, Article 22,

---

2. In appellant's brief, counsel notes his personal familiarity with the facts in *Biscoe* (as Biscoe's counsel) and states that "[a] complete understanding of the *Biscoe* decision ... requires a more in depth examination of the procedural background than is revealed in the Court of Special Appeals' decision." Counsel's intimate familiarity with *Biscoe*, and the procedural history set forth in the *Biscoe* trial record, is relevant only to the extent that it is set forth in the *Biscoe* opinion itself. What counsel remembers about the procedures and events that took place at Biscoe's police trial board or what Baltimore City's attorney argued to the circuit court judge in Biscoe's case is of no value in evaluating the holding in *Biscoe*. The precedential value of a judicial opinion comes from its holding not from factual determinations or procedural histories. *See State v. Jones*, 103 Md.App. 548, 607, 653 A.2d 1040, *rev'd on other grounds*, 343 Md. 448, 682 A.2d 248 (1996).

§ 29–41A.[3] In January of 1991, a hearing examiner denied his petition, stating:

> The Claimant does have degenerative arthritis of the right ankle which limits his ability to perform prolonged standing or walking on a persistent and regular basis. However, [I] find[ ] that the Claimant's former duties as Warrant Officer did not require extensive walking and standing on a regular basis.

In other words, the hearing examiner determined that Officer Biscoe was still able to perform "light duties" and, thus, was not totally disabled. About three months later, in April of 1991, the Director of Personnel wrote a letter to Biscoe explaining that his use of medical leave was far above the precinct average and that he needed to reduce greatly his use of leave. When Biscoe continued to use an excessive amount of sick leave, the Director recommended that he be brought before the disciplinary board. After numerous administrative and judicial hearings, Biscoe was terminated from the police force because of his inability to perform his duties—even light duty—on a full-time basis, a conclusion by the Department completely at odds with the Board's determination that Biscoe *was* able to perform light duties.

Thus, the issue in *Biscoe* was not the "permanency" of Officer Biscoe's injuries, as appellant argues, but the conflict created by the fact that the disability retirement board found that Biscoe was still able to perform light duty, and therefore not qualified for a pension, and the fact that the police department later terminated Biscoe's employment because it determined that Biscoe's injuries did *not* permit him to per-

---

**3.** The applicable Baltimore City regulation applied in *Biscoe* is similar, but not identical, to the Baltimore County provision at issue in this case. It reads as follows:

> Any member who has been determined by the hearing examiner to be totally and permanently incapacitated for the further performance of the duties of his job classification in the employ of Baltimore City, as the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on his part, shall be retired by the Board of Trustees on a special disability retirement.
> Baltimore City Code, Article 22, § 34(e).

form even light duty on a full-time basis. This conflict created an impermissible Catch–22.

It is here undisputed that the Board of Trustees and the Board of Appeals rejected Murphy's retirement disability claim because they determined that no evidence was put forward to prove that her injury was "likely to be permanent." Baltimore County Code § 23–55 presents three requirements for obtaining a disability pension. The officer must prove that he or she was (1) "totally and permanently incapacitated," (2) by an accident that occurred in the line of duty, (3) that was not caused by willful negligence on the officer's part. *Id.* In reviewing the decision of the Board of Trustees, the County Board of Appeals correctly applied the plain meaning of the statute, stating:

> The Board [of Trustees] emphasizes that the requirements of Section 23–53 of the Code must be met by the Petitioner before she is entitled to receive ordinary disability retirement. Not only must the Petitioner show that she is mentally or physically incapacitated for the further performance of duty, she must also establish that her incapacity is *likely to be permanent....* [T]he Board finds that the Petitioner has failed to show that her condition is permanent.

(Emphasis added.)

There was ample evidence in the record to support the finding that appellant did not satisfy her burden of proof by showing that her disability was "likely to be permanent." Dr. Barbara McLean, a medical doctor, was the only expert who testified before the County Board of Appeals. She acknowledged that the issue of permanency was not addressed in her report or in those of other doctors who had treated Murphy. She noted that "permanency in any medical condition is difficult.... What will happen in the future is difficult to say.... What that means, does that mean ... with psychotherapy and with a job change she could at some point return? I am not sure. And it's not really addressed." She gave no further opinion as to the issue of Murphy's permanent disabili-

ty. Under the circumstances, there was good reason for the County Board to determine that Murphy had not proven that her injury was "likely to be permanent." [4]

With that said, there is no inherent contradiction, or Catch–22, between the County Board determination that Murphy failed to prove that her injuries were permanent and the police department's determination that she was unable to fulfill her duties as a police officer. The Board of Trustees, the County Board of Appeals, the Department, and (as will be shown, *infra*) Murphy herself agreed that Murphy was disabled and at the time was unable to perform *any* police duties. Therefore, *Biscoe* is not controlling in this case. We hold that nothing in the decisions of either the Board of Trustees or the County Board of Appeals would prevent the Chief of Police from firing Murphy due to her inability to perform her police duties. The circuit court did not err in denying the writ of mandamus.

### B. Issue II—*Appellant's Due Process Claim*

■ Citing Supreme Court precedent, appellant argues that, as an employee with a vested property interest in her continued employment, her due process rights were violated because she was not given a hearing prior to being fired or shortly thereafter.[5]

---

**4.** Appellant dedicated four pages of her brief arguing against the determination by the Board of Trustees and the County Board of Appeals that she was not permanently injured. While we disagree with her contention, the contention is, at bottom, irrelevant. In her Complaint, filed in the circuit court, appellant did not request a reversal of the County Board of Appeals' decision, nor did she request that she be granted a disability pension as relief. She asked that a writ of mandamus be issued so that she would be reinstated to her former position on the police force.

**5.** In the case *sub judice*, while Murphy complains that she did not receive a hearing until May 1994, she did not request a hearing until November 29, 1993—almost three full months after her discharge. The Court of Appeals has noted that "a person illegally dismissed from office is not thereby exonerated from obligation to take steps for his own protection and may not for an unreasonable length of time acquiesce in the order of removal." *Duffey v. Rickard*, 194 Md. 228, 235,

In her brief appellant admitted that she could not perform the duties of a police officer at the time she was fired. For example, she says, "There was no dispute [in the trial court] over the fact that Murphy's mental condition prevented her from performing the tasks required of a police officer, even one filling a light duty position." Likewise, after she was fired, when she presented evidence to the County Board of Appeals, she took the same position. Nevertheless, she asked the trial court to issue a writ of mandamus ordering the police department to reinstate her in a position that she admits she could not perform. By admitting that she could no longer perform her police duties, appellant effectively gave up a claim that she had a vested property right in continued employment. An employee has no vested property interest in keeping a job that the employee admits he or she cannot perform.

Even assuming that Murphy had, at the time of her discharge, a vested right in continued employment, she was not denied due process. Under the Baltimore County Police Department Rules and Regulations and Manual of Procedure, Article 5, § 35, a police officer such as appellant with at least five years experience would normally have a vested property right in his or her job. Supreme Court precedent requires that employees with vested employment rights must receive procedural due process prior to dismissal. *See generally Gilbert v. Homar,* —— U.S. ——, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The question becomes whether, in this case, Murphy received adequate procedural due process.

The Supreme Court in *Loudermill* held that an employee with a vested property right was entitled to a limited pre-

---

71 A.2d 41 (1950) (quoting *Nicholas v. United States,* 257 U.S. 71, 75, 42 S.Ct. 7, 8–9, 66 L.Ed. 133 (1921)). Although the issue need not be here decided, it might well be argued that Murphy's delay of three months was of an unreasonable length.

termination hearing that is an "initial check against mistaken decisions" and a more comprehensive post-termination hearing. *Id.* at 545, 105 S.Ct. at 1495. The pre-termination hearing has a three-fold function: first, to give the employee notice, oral or written, of the charges or reason for termination; second, to give the employer's explanation for the charges or termination; and third, to allow the employee to present her story. *Id.* at 546, 105 S.Ct. at 1495; *see also Gilbert,* —— U.S. at ——, 117 S.Ct. at 1811.

As required by *Loudermill,* Officer Murphy was given written notice of her imminent termination, she was told why, and she was given at least one option, *i.e.,* she could take medical leave for one year. Murphy was not, however, given a pre-termination right to "tell her story" as to why she should not be dismissed. Nevertheless, as shown by the case of *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), this did not result in a denial of due process. In *Codd,* the appellant claimed that his due process rights were violated due to "stigmatizing" information contained in his old employment file that caused him to be dismissed from his subsequent job. The Supreme Court stated that in such a case the Fourteenth Amendment demands a hearing in order for the employee to refute the charges against him. *Id.* at 627, 97 S.Ct. at 883–84 (citing *Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548). "But if the hearing mandated by the Due Process Clause is to serve any useful purpose, *there must be some factual dispute between an employer and a discharged employee . . . .*" *Id.* (emphasis added). Because the plaintiff did not argue that the stigmatizing information was false, the Court determined that his right to a hearing did not exist under the Due Process Clause.

 Murphy presents us with a similar situation. The Due Process procedural safeguards are in place in order to protect the employee from a "mistaken decision." The police department and Angie Murphy agreed that Murphy had a medical condition that could not be accommodated. Murphy took the position that she could not perform any type of police

work. Thus, unless Murphy had argued below that she was no longer medically or mentally disabled and therefore was able to perform her police duties, there was no factual dispute between the two parties that could be resolved by either a pre- *or* post-termination hearing. " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Gilbert*, —— U.S. at ——, 117 S.Ct. at 1812 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). In the· case *sub judice*, Murphy was given as much process as her situation demanded.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**