GILBERT, PRESIDENT, EAST STROUDSBURG
UNIVERSITY, ET AL. *v.* HOMAR

No. 96–651.   Argued March 24, 1997—Decided June 9, 1997

*Gwendolyn T. Mosley,* Senior Deputy Attorney General of Pennsylvania, argued the cause for petitioners. With her on the brief were *D. Michael Fisher,* Attorney General, *Calvin R. Koons,* Senior Deputy Attorney General, and *John G. Knoor III,* Chief Deputy Attorney General.

*Ann Hubbard* argued the cause for the United States as *amicus curiae* in support of petitioners. On the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Waxman, Deputy Assistant Attorney General Preston, David C. Frederick, William Kanter, Jeffrica Jenkins Lee, Lorraine P. Lewis,* and *Mary S. Mitchelson.*

*James V. Fareri* argued the cause for respondent. With him on the brief was *Jennifer Harlacher Sibum.*

*Gregory O'Duden* argued the cause for the National Treasury Employees Union as *amicus curiae* urging affirmance.

With him on the brief were *Elaine Kaplan* and *Barbara A. Atkin.**

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a State violates the Due Process Clause of the Fourteenth Amendment by failing to provide notice and a hearing before suspending a tenured public employee without pay.

I

Respondent Richard J. Homar was employed as a police officer at East Stroudsburg University (ESU), a branch of Pennsylvania's State System of Higher Education. On August 26, 1992, when respondent was at the home of a family friend, he was arrested by the Pennsylvania State Police in a drug raid. Later that day, the state police filed a criminal complaint charging respondent with possession of marijuana,

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Julio A. Brady*, Attorney General of the Virgin Islands, *W. Bartlett Ary*, Assistant Attorney General, and *Dan Schweitzer*, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Jeffrey B. Pine* of Rhode Island, *Charles W. Burson* of Tennessee, *Dan Morales* of Texas, and *Jan Graham* of Utah; and for the International City-County Management Association et al. by *Richard Ruda* and *James I. Crowley*.

Briefs of *amici curiae* urging affirmance were filed for the National Association of Police Organizations, Inc., by *William J. Johnson;* for the National Education Association by *Robert H. Chanin* and *John M. West;* for the Pennsylvania State Lodge, Fraternal Order of Police, by *Gary M. Lightman;* and for the Southern States Police Benevolent Association by *J. Michael McGuinness*.

possession with intent to deliver, and criminal conspiracy to violate the controlled substance law, which is a felony. The state police notified respondent's supervisor, University Police Chief David Marazas, of the arrest and charges. Chief Marazas in turn informed Gerald Levanowitz, ESU's Director of Human Resources, to whom ESU President James Gilbert had delegated authority to discipline ESU employees. Levanowitz suspended respondent without pay effective immediately. Respondent failed to report to work on the day of his arrest, and learned of his suspension the next day, when he called Chief Marazas to inquire whether he had been suspended. That same day, respondent received a letter from Levanowitz confirming that he had been suspended effective August 26 pending an investigation into the criminal charges filed against him. The letter explained that any action taken by ESU would not necessarily coincide with the disposition of the criminal charges.

Although the criminal charges were dismissed on September 1, respondent's suspension remained in effect while ESU continued with its own investigation. On September 18, Levanowitz and Chief Marazas met with respondent in order to give him an opportunity to tell his side of the story. Respondent was informed at the meeting that the state police had given ESU information that was "very serious in nature," Record, Doc. No. 26, p. 48, but he was not informed that that included a report of an alleged confession he had made on the day of his arrest; he was consequently unable to respond to damaging statements attributed to him in the police report.

In a letter dated September 23, Levanowitz notified respondent that he was being demoted to the position of groundskeeper effective the next day, and that he would receive backpay from the date the suspension took effect at the rate of pay of a groundskeeper. (Respondent eventually received backpay for the period of his suspension at the rate of pay of a university police officer.) The letter maintained

that the demotion was being imposed "as a result of admissions made by yourself to the Pennsylvania State Police on August 26, 1992 that you maintained associations with individuals whom you knew were dealing in large quantities of marijuana and that you obtained marijuana from one of those individuals for your own use. Your actions constitute a clear and flagrant violation of Sections 200 and 200.2 of the [ESU] Police Department Manual." App. 82a. Upon receipt of this letter, the president of respondent's union requested a meeting with President Gilbert. The requested meeting took place on September 24, at which point respondent had received and read the police report containing the alleged confession. After providing respondent with an opportunity to respond to the charges, Gilbert sustained the demotion.

Respondent filed this suit under Rev. Stat. § 1979, 42 U. S. C. § 1983, in the United States District Court for the Middle District of Pennsylvania against President Gilbert, Chief Marazas, Levanowitz, and a Vice President of ESU, Curtis English, all in both their individual and official capacities. He contended, *inter alia*, that petitioners' failure to provide him with notice and an opportunity to be heard before suspending him without pay violated due process. The District Court entered summary judgment for petitioners. A divided Court of Appeals reversed the District Court's determination that it was permissible for ESU to suspend respondent without pay without first providing a hearing. 89 F. 3d 1009 (CA3 1996). We granted certiorari. 519 U. S. 1052 (1997).

## II

The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected "property" interest. Although we have previously held that public employees who can be discharged only for cause have a constitutionally protected property interest in

their tenure and cannot be fired without due process, see *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 578 (1972); *Perry* v. *Sindermann*, 408 U. S. 593, 602–603 (1972), we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination. Petitioners, however, do not contest this preliminary point, and so without deciding it we will, like the District Court, "[a]ssum[e] that the suspension infringed a protected property interest," App. to Pet. for Cert. 59a, and turn at once to petitioners' contention that respondent received all the process he was due.

## A

In *Cleveland Bd. of Ed.* v. *Loudermill*, 470 U. S. 532 (1985), we concluded that a public employee dismissable only for cause was entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing. Stressing that the pretermination hearing "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action," *id.*, at 545–546, we held that pretermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story, *id.*, at 546. In the course of our assessment of the governmental interest in immediate termination of a tenured employee, we observed that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending *with pay.*" *Id.*, at 544–545 (emphasis added; footnote omitted).

Relying on this dictum, which it read as "strongly suggest-[ing] that suspension without pay must be preceded by notice and an opportunity to be heard *in all instances*," 89 F. 3d, at 1015 (emphasis added), and determining on its own that

such a rule would be "eminently sensible," *id.*, at 1016, the Court of Appeals adopted a categorical prohibition: "[A] governmental employer may not suspend an employee without pay unless that suspension is preceded by some kind of presuspension hearing, providing the employee with notice and an opportunity to be heard." *Ibid.* Respondent (as well as most of his *amici*) makes no attempt to defend this absolute rule, which spans all types of government employment and all types of unpaid suspensions. Brief for Respondent 8, 12–13. This is eminently wise, since under our precedents such an absolute rule is indefensible.

It is by now well established that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 895 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause. See, *e. g., United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 53 (1993); *Zinermon* v. *Burch*, 494 U. S. 113, 128 (1990) (collecting cases); *Barry* v. *Barchi*, 443 U. S. 55, 64–65 (1979); *Dixon* v. *Love*, 431 U. S. 105, 115 (1977); *North American Cold Storage Co.* v. *Chicago*, 211 U. S. 306, 314–320 (1908). Indeed, in *Parratt* v. *Taylor*, 451 U. S. 527 (1981), overruled in part on other grounds, *Daniels* v. *Williams*, 474 U. S. 327 (1986), we specifically noted that "we have rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property." 451 U. S., at 540. And in *FDIC* v. *Mallen*, 486 U. S. 230 (1988), where we unanimously approved the Federal Deposit Insurance Corporation's (FDIC's) suspension, without prior hearing, of an indicted private bank employee, we said: "An important gov-

ernment interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.*, at 240.*

The dictum in *Loudermill* relied upon by the Court of Appeals is of course not inconsistent with these precedents. To say that when the government employer perceives a hazard in leaving the employee on the job it "can avoid the problem by suspending with pay" is not to say that that is the only way of avoiding the problem. Whatever implication the phrase "with pay" might have conveyed is far outweighed by the clarity of our precedents which emphasize the flexibility of due process as contrasted with the sweeping and categorical rule adopted by the Court of Appeals.

## B

To determine what process is constitutionally due, we have generally balanced three distinct factors:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute pro-

---

*It is true, as respondent contends, that in *Mallen* we did not expressly state whether the bank president's suspension was with or without pay. But the opinion in *Mallen* recites no order from the FDIC, if it had authority to issue such an order, that the bank pay its president; only an order that the bank suspend its president's participation in the bank's affairs. Our opinion in *Mallen* certainly reflects the assumption that the suspension would be *without* pay. For example, in discussing the private interest at stake we considered "the severity of depriving someone of his or her livelihood." 486 U. S., at 243 (citing cases). And, Mallen argued to this Court that "denial of an income stream to underwrite these extraordinary expenses can be crucial, not only to Mallen's financial condition in general, but to his ability to pay for his criminal defense." Brief for Appellee in *FDIC* v. *Mallen*, O. T. 1987, No. 87–82, pp. 7–8.

cedural safeguards; and finally, the Government's interest." *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976).

See also, *e. g., Mallen, supra,* at 242; *Logan* v. *Zimmerman Brush Co.,* 455 U. S. 422, 434 (1982).

Respondent contends that he has a significant private interest in the uninterrupted receipt of his paycheck. But while our opinions have recognized the severity of depriving someone of the means of his livelihood, see, *e. g., Mallen, supra,* at 243; *Loudermill,* 470 U. S., at 543, they have also emphasized that in determining what process is due, account must be taken of "the *length*" and "*finality* of the deprivation," *Logan, supra,* at 434 (emphasis added). Unlike the employee in *Loudermill,* who faced *termination,* respondent faced only a *temporary suspension* without pay. So long as the suspended employee receives a sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all, Brief for United States as *Amicus Curiae* 18; Record, Doc. No. 19, p. 7.

On the other side of the balance, the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers. Respondent contends that this interest in maintaining public confidence could have been accommodated by suspending him *with* pay until he had a hearing. We think, however, that the government does not have to give an employee charged with a felony a paid leave at taxpayer expense. If his services to the government are no longer useful once the felony charge has been filed, the Constitution does not require the government to bear the added expense of hiring a replacement while still paying him. ESU's interest in preserving public confidence in its police force is at least as significant as the State's interest in preserving the integrity of the sport of horse racing, see *Barry* v. *Barchi, supra,* at 64,

an interest we "deemed sufficiently important . . . to justify a brief period of suspension prior to affording the suspended trainer a hearing," *Mallen*, 486 U. S., at 241.

The last factor in the *Mathews* balancing, and the factor most important to resolution of this case, is the risk of erroneous deprivation and the likely value of any additional procedures. Petitioners argue that any presuspension hearing would have been worthless because pursuant to an Executive Order of the Governor of Pennsylvania a state employee is automatically to be suspended without pay "[a]s soon as practicable after [being] formally charged with . . . a felony." 4 Pa. Code § 7.173 (1997). According to petitioners, supervisors have no discretion under this rule, and the mandatory suspension without pay lasts until the criminal charges are finally resolved. See Tr. of Oral Arg. 20. If petitioners' interpretation of this order is correct, there is no need for any presuspension process since there would be nothing to consider at the hearing except the independently verifiable fact of whether an employee had indeed been formally charged with a felony. See *Codd* v. *Velger*, 429 U. S. 624, 627–628 (1977) *(per curiam)*. Cf. *Loudermill, supra*, at 543. Respondent, however, challenges petitioners' reading of the Code, and contends that in any event an order of the Governor of Pennsylvania is a "mere directiv[e] which do[es] not confer a legally enforceable right." Brief for Respondent 20. We need not resolve this disputed issue of state law because even assuming the Code is only advisory (or has no application at all), the State had no constitutional obligation to provide respondent with a presuspension hearing. We noted in *Loudermill* that the purpose of a pre-*termination* hearing is to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U. S., at 545–546. By parity of reasoning, the purpose of any pre-*suspension* hearing would be to assure that there are reasonable grounds to support the suspension without pay.

Cf. *Mallen,* 486 U. S., at 240. But here that has already been assured by the arrest and the filing of charges.

In *Mallen,* we concluded that an "*ex parte* finding of probable cause" such as a grand jury indictment provides adequate assurance that the suspension is not unjustified. *Id.,* at 240–241. The same is true when an employee is arrested and then formally charged with a felony. First, as with an indictment, the arrest and formal charges imposed upon respondent "by an independent body demonstrat[e] that the suspension is not arbitrary." *Id.,* at 244. Second, like an indictment, the imposition of felony charges "itself is an objective fact that will in most cases raise serious public concern." *Id.,* at 244–245. It is true, as respondent argues, that there is more reason to believe an employee has committed a felony when he is indicted rather than merely arrested and formally charged; but for present purposes arrest and charge give reason enough. They serve to assure that the state employer's decision to suspend the employee is not "baseless or unwarranted," *id.,* at 240, in that an independent third party has determined that there is probable cause to believe the employee committed a serious crime.

Respondent further contends that since (as we have agreed to assume) Levanowitz had discretion *not* to suspend despite the arrest and filing of charges, he had to be given an opportunity to persuade Levanowitz of his innocence before the decision was made. We disagree. In *Mallen,* despite the fact that the FDIC had *discretion* whether to suspend an indicted bank employee, see 64 Stat. 879, as amended, 12 U. S. C. § 1818(g)(1); *Mallen, supra,* at 234–235, and n. 5, we nevertheless did not believe that a presuspension hearing was necessary to protect the private interest. Unlike in the case of a termination, where we have recognized that "the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect," *Loudermill, supra,* at 543, in the case of a suspension there will be ample opportunity to invoke

discretion later—and a short delay actually benefits the employee by allowing state officials to obtain more accurate information about the arrest and charges. Respondent "has an interest in seeing that a decision concerning his or her continued suspension is not made with excessive haste." *Mallen*, 486 U. S., at 243. If the State is forced to act too quickly, the decisionmaker "may give greater weight to the public interest and leave the suspension in place." *Ibid.*

## C

Much of respondent's argument is dedicated to the proposition that he had a due process right to a presuspension hearing because the suspension was open-ended and he "theoretically may not have had the opportunity to be heard for weeks, months, or even years after his initial suspension without pay." Brief for Respondent 23. But, as respondent himself asserts in his attempt to downplay the governmental interest, "[b]ecause the employee is entitled, in any event, to a prompt post-suspension opportunity to be heard, the period of the suspension should be short and the amount of pay during the suspension minimal." *Id.*, at 24–25.

Whether respondent was provided an adequately prompt *post*-suspension hearing in the present case is a separate question. Although the charges against respondent were dropped on September 1 (petitioners apparently learned of this on September 2), he did not receive any sort of hearing until September 18. Once the charges were dropped, the risk of erroneous deprivation increased substantially, and, as petitioners conceded at oral argument, there was likely value in holding a prompt hearing, Tr. of Oral Arg. 19. Cf. *Mallen*, *supra*, at 243 (holding that 90 days before the agency hears and decides the propriety of a suspension does not exceed the permissible limits where coupled with factors that minimize the risk of an erroneous deprivation). Because neither the Court of Appeals nor the District Court addressed whether, under the particular facts of this case, peti-

tioners violated due process by failing to provide a sufficiently prompt postsuspension hearing, we will not consider this issue in the first instance, but remand for consideration by the Court of Appeals.

\*  \*  \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*