717 A.2d 976

The CITY OF ANNAPOLIS et al.

v.

Kenneth E. ROWE, Jr. et al.

No. 1416, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Sept. 30, 1998.

268

Rignal W. Baldwin, Jr., (Jonathan P. Kagan, Brassel & Baldwin, P.A. and Paul Garvey Goetzke, on the brief), Annapolis, for Appellants.

Ronald A. Baradel (Council, Baradel, Kosmerl & Nolan, P.A., on the brief), Annapolis, for Appellees.

Argued before SALMON and EYLER, JJ., and ROSALYN B. BELL, Judge (retired), Specially Assigned.

SALMON, Judge.

On October 15, 1992, Lieutenant Kenneth E. Rowe, Jr., of the Anne Arundel County Fire Department, and his wife, Kimberly, filed suit against appellant, the City of Annapolis (the "City"). They also sued Mayor Alfred A. Hopkins; Fire Chief Edward P. Sherlock, Jr.; Deputy Chief Charles W. Smith III; and former City Attorney Jonathan A. Hodgson. The complaint set forth six causes of action. The counts and allegations were: Count I, a violation of Lt. Rowe's rights under 42 U.S.C. § 1983; Count II, a violation of Lt. Rowe's Maryland constitutional rights; Count III, intentional infliction of emotional distress; Count IV, defamation; Count V, negligence; and Count VI, loss of consortium. Prior to trial, the court granted summary judgment in favor of all defendants as to Count III. In regard to Count IV, the defamation count, the court granted summary judgment as to Deputy

Chief Charles W. Smith but denied the motion as to the remaining defendants. And, as against all defendants except the City, the court granted summary judgment as to Count V.

After a bench trial, the trial judge granted judgment to the City as to Count V and to all defendants as to Count IV but ruled against the City and in favor of Lt. Rowe as to Count I (violation of constitutional rights as protected by 42 U.S.C. § 1983) and Count II (denial of Lt. Rowe's rights as protected by the Maryland Constitution). In regard to Count VI, a joint claim by Lt. Rowe and his wife for loss of consortium, the court ruled in favor of the City insofar as the count attempted to assert a claim for loss of consortium under 42 U.S.C. § 1983 but granted judgment in favor of the Rowes on the portion of their claim that sought recompense for loss of consortium due to a violation of rights protected by the Maryland Constitution. The court awarded Lt. Rowe $30,000 for the violation of his state and federal constitutional rights and awarded $20,000 to Lt. Rowe and his wife, jointly, for loss of consortium. The trial court also awarded plaintiff's attorneys' fees for amounts charged by the Rowes' counsel in litigating the 42 U.S.C. § 1983 claim.

In deciding the case, the trial judge correctly pointed out that Article 24 of the Maryland Constitution, like the Due Process Clause of the Fourteenth Amendment, "protects due process rights and is construed *in pari materia* with the federal Due Process Clause." (Citing *Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052 (1980)). His decision in favor of the Rowes was based on three conclusions:

1. That Lt. Rowe, as a firefighter with 24 years experience, had a due process right to a hearing, prior to being terminated.

2. That Lt. Rowe was terminated by the City from his job as a firefighter on November 1, 1991, without a hearing.

3. Assuming, *arguendo*, that Lt. Rowe was not terminated on November 1, 1991, he still suffered a constitutional

deprivation when he was suspended on November 1st and deprived of his right to practice his trade.

The City filed this timely appeal raising three issues:

I. Whether the lower court erred in finding that Lt. Rowe was "terminated" on November 1, 1991, by a "notice of disciplinary action" letter that was given to appellee that day.

II. Whether the lower court erred in finding that Lt. Rowe was deprived of a constitutionally protected property interest in "continued employment" although he received full salary and benefits during the two-month period he was off from work.

III. Whether the lower court erred in finding that Lt. Rowe's federal and state constitutional due process rights were violated when the City did not provide appellee a hearing before he was suspended with pay.

We answer each of these questions in the affirmative and reverse.

## BACKGROUND FACTS

In August 1991, an internal affairs investigation of the Annapolis Police Department uncovered evidence that certain Annapolis City police officers and Annapolis Fire Department personnel had engaged in on-duty sexual misconduct with local women who called themselves "the Road Warriors." Lt. Rowe was implicated in the investigation when Sheryl B., a former employee of the Fire Department, told the investigators that her aunt, Pam H., had told her that she had engaged in sexual relations with Lt. Rowe.[1] Ms. B. did not know whether the sexual relations took place while Lt. Rowe was on or off duty.[2]

---

1. Pam H. is the cousin of appellee, Kimberly Rowe, and a friend of the Rowe family. Lt. Rowe vehemently denied ever having had sex with Pam H. He testified that although Pam H. frequently came by the fire station, she did so "just to drop off candy or cookies for those on duty."

2. It is a violation of departmental regulations to have sex while on duty. Off-duty sex is unregulated.

On October 16, 1991, Deputy Chief Charles Smith and firefighter Daniel Early questioned Lt. Rowe about whether he had ever personally been involved in, or knew about other firefighters who had engaged in, on-duty sexual relations. Lt. Rowe was not informed that he was suspected of any specific improper conduct. He denied having been involved in any on-duty sexual activity and said he was unaware of any other Fire Department personnel who had engaged in such activity.

Smith and Early also interviewed Kevin Thompson, a firefighter, who told them that Pam H. frequently visited Lt. Rowe at the fire station. Additionally, Thompson stated that he had heard noises being made by firefighter Christy Shannon, which indicated that she was engaged in "some type of sexual activity" while she was in the Station Captain's office with Lt. Rowe. Firefighter John Farrar acknowledged that he had seen Ms. Shannon and Lt. Rowe in the Station Captain's office and that Kevin Thompson had told him that he had heard "sexual noises" coming from that office.

When Ms. Shannon was interviewed she denied ever engaging in sexual activities with Lt. Rowe. She did claim, however, that on one occasion Lt. Rowe had acted improperly. She alleged that once, while she was taking a shower at the fire station, Lt. Rowe had entered the ladies' locker room and indecently exposed himself to her.

Based on the interviews and interrogations held by Smith and Early, Chief Edward Sherlock brought disciplinary action against Lt. Rowe and firefighter Robert Thomas. Thomas, like Lt. Rowe, had denied either being involved in or having knowledge of any on-duty sexual relations, although others had implicated him in such activities.

On November 1, 1991, Lt. Rowe received a "Notice of Disciplinary Action" (the "Notice"), signed by Chief Sherlock, which stated, *inter alia*, that he had determined that Lt. Rowe had "engaged in prohibited sexual conduct" while on duty as an Annapolis firefighter and that he had given "false and misleading answers to the questions that were asked ... by Deputy Chief Smith in the course of th[e] investigation." The

Notice gave no specific information regarding when, where, or with whom Lt. Rowe had engaged in prohibited sexual activities. The Notice concluded by stating:

This is to advise you that you are terminated from the Annapolis Fire Department effective November 21, 1991. Until that date you will continue to receive pay but your services shall no longer be required by the Department.

As is established by Section 3.16.120 of the Annapolis City Code, you shall be afforded a hearing before me to respond to the reasons for this disciplinary action. You must request this hearing in writing no later than November 8, 1991....

On November 5, 1991, Lt. Rowe delivered a letter to Chief Sherlock requesting a hearing on the matter. Pursuant to Annapolis City Code § 3.16.120F, Lt. Rowe was afforded a hearing on November 15, 1991, to respond to and challenge the proposed disciplinary action. At the hearing, Lt. Rowe, through his attorney, contended that the Notice was too vague to respond to, stating, "We have not yet been told why [Lt. Rowe] is being terminated, and until we are told we cannot tell you why he should not be terminated. Until we are notified, there is nothing to which we can respond."

On November 19, 1991, Lt. Rowe filed suit in the Circuit Court for Anne Arundel County seeking an injunction to (1) prohibit his termination and (2) require that the City provide him with written notification of the reasons for his termination as required by Annapolis City Code § 3.16.120D. As a result of the suit, and on the same day suit was filed, the City withdrew the Notice "for the purposes of providing a more detailed statement of [Lt. Rowe's] departmental violations and any intended disciplinary action to result."

Lt. Rowe, on December 2, 1991, received a revised Notice of Disciplinary Action that detailed the specific sexual misconduct with which he was charged. The revised Notice was from Chief Sherlock, who said, in part:

Ms. Shannon also states ... that there were occasions when you and a civilian female, who has been shown by this

investigation to have participated liberally in on-duty sexual activity with other Firefighters and Police Officers, would enter the Station Officer's Office at Station 39 and close the door. Ms. Shannon states that once inside the Station Officer's Office the two of you would remain behind those closed doors for periods of time ranging from fifteen minutes to less than two hours. These statements of Ms. Shannon are corroborated by the statement of Firefighter Kevin Thompson.

The Chief advised Lt. Rowe that he believed that "a preponderance of the evidence" would support the conclusion that sexual activities occurred between the civilian female and Lt. Rowe but that the behavior was unacceptable in any case because it "resulted in the effective removal" of the highest ranking officer from the station house and "set a poor and unacceptable example for subordinate officers." The revised Notice also said that the Chief believed Ms. Shannon's story, which was that Lt. Rowe had entered a room where Ms. Shannon was taking a shower; he had waited for her to emerge from the shower and then had pulled her toward him and, with his "genitals exposed," his "penis came in contact with her back." The revised Notice further informed Lt. Rowe that he was not to report to work again and that he would be terminated effective January 2, 1992, at 8 a.m., but that until that time he would continue to receive full pay and benefits. Lt. Rowe was again informed that he would be afforded a hearing on the matter but that he must make a request for a hearing by December 6th. Lt. Rowe did not request a hearing from Chief Sherlock. Instead, on December 6, 1991, he exercised his rights under Annapolis City Code § 3.16.150 and appealed the Chief's Notice of Disciplinary Action directly to the Civil Service Board.

Also on December 6, 1991, the Fire Department commenced a hearing regarding Robert Thomas. On the second day of the hearing, David Early, one of the key investigators in the case, testified that he had had sex with one of the Road Warriors. Early also confirmed that Chief Edward Sherlock knew, some six months earlier, of his involvement with one of

the women involved in the sex scandal. Charges against Thomas were dismissed on December 9, 1991, and he was promptly reinstated.[3]

On December 30, 1991, the Mayor of Annapolis issued a written public statement in which he noted that "a number of procedures have been rightfully called into question" regarding the internal affairs investigation of the allegations of sexual misconduct by Annapolis police and fire officials.[4] He continued: "In view of the personally destructive nature of the continued hearings, I have asked that all charges against Lt. Kenneth Rowe be dropped immediately and this entire episode be brought to a close."

Lt. Rowe received an official "Notice of Disciplinary Action Withdrawal"[5] on January 2, 1992, which informed him that he would not be terminated and that he was to report to duty on January 4, 1992. He reported for work as scheduled and remains a firefighter for the City of Annapolis.

## DISCUSSION

"Supreme Court precedent requires that employees with vested employment rights must receive procedural due process prior to dismissal." *Murphy v. Baltimore County,* 118 Md.App. 114, 124, 701 A.2d 1208 (1997) (citing *Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997)); *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Mathews v. Eldridge.*

---

3. *See Thomas v. City of Annapolis,* 113 Md.App. 440, 688 A.2d 448 (1997).

4. It appears that during the Thomas case the City's case against Lt. Rowe was seriously weakened when it was revealed that one of the City's witnesses recanted her prior testimony. Also, the revelations regarding David Early hurt the City's case against Lt. Rowe because, at a minimum, it showed that at least one of the investigators may not have been completely objective.

5. Lt. Rowe received the Notice of Disciplinary Action Withdrawal approximately three hours after 8 a.m. on January 2, 1992. That three-hour delay in notification resulted in no adverse consequences to Lt. Rowe.

424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Procedural due process claims require a two-step analysis. *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir.1996). The first step is to determine whether the plaintiff was deprived of a protected property interest. Only if the answer to that question is in the affirmative do we then ask, "What process is due?" *Id.*

To determine what process is constitutionally due, we have generally balanced three distinct factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

*Gilbert,* 520 U.S. at ——, 117 S.Ct. at 1812 (some citations omitted).

■ Due process is generally satisfied by a limited pretermination hearing followed by a more comprehensive post-termination hearing. *Gilbert,* 520 U.S. at ——, 117 S.Ct. at 1811 (citing *Loudermill, supra* ). "[T]he pretermination hearing 'should be an initial check against mistaken decisions.' " *Id.* (quoting *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1489).

Although the Supreme Court has consistently held that a public employee dismissible only for cause cannot be *terminated* without due process, *see, e.g., Roth,* 408 U.S. at 578, 92 S.Ct. at 2709, it has "not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees *short of termination." Gilbert,* 520 U.S. at ——, 117 S.Ct. at 1811 (emphasis added).

It is undisputed that Lt. Rowe had a constitutionally protected property interest in his continued employment.[6] The

---

**6.** Pursuant to Annapolis City Code § 3.16.070, a newly hired employee is subject to a twelve- to eighteen-month probationary status after

City, however, argues that "the lower court erred in finding that Lt. Rowe was 'terminated' on November 1, 1991, by a 'Notice of Disciplinary Action' letter that was given to appellee that day."

Agreeing with the City that the decisive issue in this case depends on whether the City deprived Lt. Rowe of a constitutional right by its actions on November 1, 1991, the Rowes admit that:

> resolution of this case hinges on a determination of whether or not a "deprivation" occurred on November 1, 1991. If it *did,* it is clear that Lt. Rowe received no due process to that point, and the decision below should be affirmed in its entirety. *If, as [a]ppellants contend, a deprivation never took place, ... Lt. Rowe was not entitled to any due process, and there were no rights of his to be violated.*

(Second emphasis added.)

## A.

The trial court relied on three cases in support of its determination that Lt. Rowe "effectively was terminated" by the November 1, 1991, Notice of Disciplinary Action: *Seibert v. State of Oklahoma ex. rel. University of Oklahoma Health Sciences Ctr.,* 867 F.2d 591 (10th Cir.1989); *Gniotek v. City of Philadelphia,* 808 F.2d 241 (3d Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987); *Thurston v. Dekle,* 531 F.2d 1264 (5th Cir.1976).

In *Seibert,* an employee with a constitutionally protected property interest in his continued employment was terminated for insubordination. His pay and benefits were immediately discontinued. The termination was not official for at least ten working days, however, because pursuant to his employer's policy he was afforded the right to challenge his termination. *Seibert,* 867 F.2d at 593. Appellant never exercised his right

---

which he or she may be granted permanent status if "the services of the employee have been found satisfactory" and the personnel director so recommends. Annapolis City Code § 3.16.080.

to a hearing and after ten days he was sent a letter stating that he was officially terminated. *Id.* Appellant then filed suit claiming, among other things, that his due process rights were violated.

On appeal, the United States Court of Appeals for the Tenth Circuit held that the employee effectively was terminated on the day that he was first notified that he was going to be terminated and not on the termination date mentioned in the official letter of termination. *Id.* at 597. The court explained:

> Although a termination technically is not final for ten days [after the receipt of the notice of termination], in our view the University's policies demonstrate that as a practical matter, termination occurs as soon as the employee is given "notice of termination." During the ten-day period and during the pendency of grievance procedure . . ., the employee is not allowed to work. *More to the point, the employee receives no pay during that time.* In addition, if the employee's grievance is not successful and the termination ultimately is upheld, then the effective date of the termination relates back to the date of the initial notice.

*Id.* at 597–98 (emphasis added; citations omitted).

In the second case, *Gniotek v. City of Philadelphia*, six Philadelphia police officers were identified in testimony in a federal court as bribe recipients. *Gniotek*, 808 F.2d at 242. Upon learning of this testimony, the Philadelphia Police Ethics Accountability Division (EAD) summonsed the officers to EAD headquarters to discuss the matter. Each officer was given his *Miranda* [7] warnings and was asked if he would like to make a statement. *Id.* On the advice of counsel, each of the officers declined to speak. The officers immediately received a pre-prepared "Notice of Suspension with Intent to Dismiss," which was effective immediately and suspended the officers without pay for a period of 30 days or until dismissal. *Id.* Four days later, the officers received a "Notice of Inten-

---

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tion to Dismiss" that specified the charges against them and stated that, if an individual officer thought the dismissal was unjustified, he could, within ten days, submit his claim before the board. *Id.* Each officer was officially dismissed at the end of the ten-day period. *Id.*

The Third Circuit found that the officers' deprivation occurred when they were suspended without pay, not when they were officially dismissed ten days later. *Id.* at 243. The court held that before the police officers could be "suspended with intent to dismiss[,] they were entitled to whatever pretermination procedures the Constitution mandates prior to actual dismissal." *Id.* at 244. The court based its reasoning on the fact that it found "the suspensions [without pay] with intent to dismiss were *de facto* dismissals and the deprivation, therefore, occurred when they were suspended, i.e., before they were given 10 days to respond [to the notices of dismissal]." *Id.* at 243.

In *Thurston v. Dekle*, appellant was given a letter on August 13, 1973, stating that he was suspended as of that day. *Thurston*, 531 F.2d at 1266. The letter advised that his suspension would be without pay for 30 days after which he was to be discharged permanently. *Id.* The employee also was informed of his right to appeal. Appellant's suspension and termination were upheld after a hearing on September 10th before the Civil Service Board of the City of Jacksonville. *Id.*

On appeal, the Fifth Circuit held that appellant was entitled to a pre-suspension hearing. *Id.* at 1272. The court explained:

The City argues that its employees may seek review of their suspension without pay. *During this period of suspension without pay, however, the employees lose all benefits of employment.* In addition, the suspension automatically becomes termination unless the Civil Service Board on review orders reinstatement and backpay. The [trial c]ourt correctly saw this suspension process as no more than a facade. It held that "in reality, 'suspension' under the

present state of facts ... is subject to the condition subsequent that an employee may be reinstated with backpay upon successful appeal." *Since suspension without pay is in reality termination, the city must provide whatever pretermination procedures the Constitution mandates prior to suspension without pay.*

*Id.* (emphasis added) (first omission in original).

We do not contest the soundness of the decisions just reviewed. Each of these cases, however, involved employees who were suspended without pay pending termination and, thus, are distinguishable from the case *sub judice.* This distinction is important. When an employee's paycheck is discontinued pending termination, he has lost the major benefit of his employment and has suffered a deprivation similar to an actual termination. Hence, in such cases, a suspension without pay amounts to a *de facto* termination. In each of the cases relied upon by the trial court, the courts particularly emphasized that the employee received no pay while the employee's hearing was pending. And, significantly, appellees cite no case from any jurisdiction where the court has held that an employee who is suspended with pay is entitled to a pre-suspension hearing.[8]

The Annapolis City Code requires that an employee be afforded a hearing prior to being terminated. Section 3.16.120 of the Code, in pertinent part, reads:

D. When the appointing authority takes disciplinary action pursuant to this chapter, the appointing authority shall file with the employee and the personnel director a written notification containing a statement of the reasons for the action.

\* \* \*

F. *Prior to the imposition of discipline consisting of suspension without pay, demotion or dismissal, the em-*

---

**8.** Appellees also cite *Jones v. City of Gary,* 57 F.3d 1435 (7th Cir.1995), which held that a public employee who may only be suspended "for cause" has a property interest in continued employment and, thus, may not be suspended *without pay* without a pre-suspension hearing.

*ployee may file with the appointing authority and person-*
*nel department a written request to be heard informally by*
*the appointing authority in response to the reason for the*
*action.* Such a request shall be filed not later than five
working days following the date of the notice of disciplinary
action. . . . The employee's right to a hearing . . . shall be
waived if not timely filed.

(Emphasis added.) It is clear from a plain reading of subsec-
tion F, coupled with the unambiguous words in the Notice,
that appellant was not terminated on November 1, 1991.
Moreover, because Lt. Rowe's salary and benefits were never
discontinued, there was not a *de facto* dismissal. From the
first Notice of Disciplinary Action it was crystalline that
November 21, 1991, was the earliest date that Lt. Rowe could
be terminated and the earliest date that his benefits and
salary could be discontinued.[9]

Lt. Rowe attempts to draw a distinction between his case
and others relied upon by the City by arguing that the Notice
"issued to [him] was an *announcement* as to what Chief
Sherlock had *already concluded* about [the charges against
him], and what he had *already determined* should be done
about them." (Emphasis in original.) Appellee, we presume,
is arguing that it was unconstitutional for Chief Sherlock to
have made a decision to terminate him before he was provided
with a hearing. The case of *Jackson v. St. Joseph State
Hospital*, 840 F.2d 1387 (8th Cir.), *cert. denied,* 488 U.S. 892,
109 S.Ct. 228, 102 L.Ed.2d 218 (1988), addresses this issue.

In *Jackson*, appellant was placed on administrative leave
with pay pending an investigation of an alleged incident that
took place between Jackson and a female co-worker. *Id.* at
1389. Three weeks later, appellant received a dismissal letter,
which informed him that his employment (and salary) would
be terminated effective 11 days hence. He was further in-

---

9. Moreover, Lt. Rowe's benefits and salary potentially would not be
terminated for up to 120 working days if he followed the appeals
procedures provided for in the Annapolis City Code. *See* Annapolis
City Code §§ 3.16.120 and 3.16.150.

formed that he had a right to a hearing to show cause why he should not be fired. *Id.* Appellant filed a written response explaining why he should not be terminated. The board, however, rejected his explanation and upheld the decision to terminate the employee. *Id.*

On appeal, appellant argued that his due process rights were violated "because his termination letter indicated that the decision to terminate had already been made." *Id.* at 1391. The Eighth Circuit held that the Due Process Clause "does not require predecision hearings. *It only requires an opportunity to be heard prior to the termination of benefits."* *Id.* (emphasis added). The court further stated:

> Jackson's benefits—his salary—were not terminated until February 28, 1983. From February 17 until February 28 he had the opportunity to present his case and on February 23, 1983 he made a written response to the dismissal letter. Because Jackson was given the opportunity to be heard prior to the termination of his salary, his due process rights were not violated.

*Id.*

*Jackson* is here apposite. We hold that the trial court erred in determining that Lt. Rowe "effectively was terminated" on November 1, 1991, when he received the Notice. The City was not required to give Lt. Rowe a hearing prior to November 1, 1991.[10]

## B.

The trial court held that, even if Lt. Rowe was not effectively terminated by the November 1, 1991, Notice, he still (1) had a right to a pre-suspension hearing and (2) suffered a constitutional deprivation because he was denied such a hearing.

■ It is well-recognized that a government employee is entitled to procedural due process only when he has been deprived of a constitutionally protected property or liberty

---

**10.** Proceeding on the assumption that Lt. Rowe was terminated on November 1, 1991, the trial judge ruled that an employer cannot terminate an employee without a pre-termination hearing.

interest.[11] *Winegar v. Des Moines Indep. Community Sch.
Dist.*, 20 F.3d 895, 899 (8th Cir.), *cert. denied,* 513 U.S. 964,
115 S.Ct. 426, 130 L.Ed.2d 340 (1994). When a property
interest exists, an employee is generally entitled to a hearing
before being deprived of that interest. *Cleveland Bd. of Educ.
v. Loudermill, supra,* 470 U.S. at 542, 105 S.Ct. at 1493.
Thus, as the lower court recognized:

> In assessing the merits of a due process claim by a public
> employee who has been disciplined, a court must determine
> "(a) whether the discipline imposed deprived [the employee]
> of a property interest protected by the Fourteenth Amend-
> ment and (b) if so, whether the manner in which the
> discipline was imposed satisfied constitutionally mandated
> protections." *Garraghty[ v. Jordan],* 830 F.2d [1295,]
> 1299[ (4th Cir.1987) ], *citing Board of Regents v. Roth,* 408
> U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As part of
> that inquiry, a court must consider at what point the
> employee was entitled to due process and what level of due
> process was required.

■■ The trial court found that the discipline imposed
upon Lt. Rowe, whether the discipline is viewed as a termi-
nation or merely a suspension, did deny Lt. Rowe of a
property interest protected by the Fourteenth Amendment.
We disagree. As will be shown, Lt. Rowe's "suspension" did
not deprive him of a property right. Therefore, it is irrelevant
"whether the manner in which the discipline was imposed
satisfied constitutionally mandated protections." [12]

---

**11.** The trial judge, citing *Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct.
1155, 47 L.Ed.2d 405 (1976), found no violation of Lt. Rowe's liberty
interest. *See infra* note 13.

**12.** Although the issue need not be decided because of our holding that
Lt. Rowe was not deprived of a property interest, we think that the trial
judge also erred when he ruled that if he assumed that Lt. Rowe was
merely suspended with pay, and not fired, on November 1, 1991, Lt.
Rowe was still entitled to a pre-suspension hearing. The trial judge
said:

> Under *Loudermill,* a public employer may suspend an employee
> with pay without notice or an opportunity to be heard, if it perceives

In support of his conclusion that Lt. Rowe was deprived of a constitutional right when he was suspended with pay, the court opined:

> a "significant hazard in keeping the employee on the job." *Everett v. Napper,* 833 F.2d 1507, 1512 (11 Cir.1987) (quoting *Loudermill,* 470 U.S. [at] 544–45, [105 S.Ct. at 1495]). *See also Morton v. Beyer,* 822 F.2d 364, 369 n. 11 (3d Cir.1987) (public employee who poses a significant hazard is not constitutionally entitled to any kind of hearing).
>
> In the present action, the City would have been justified in suspending Rowe with pay without a hearing if the City had perceived a "significant hazard" in keeping him on duty while the charges were resolved. However, there was no evidence at trial that [the City] perceived a "significant hazard" in keeping Rowe at work when he was suspended November 1.

(Footnote omitted.)

 In *Loudermill,* the Supreme Court addressed the issue of whether Mr. Loudermill, a classified civil servant dismissible only "for cause," was denied due process when he was not given a hearing prior to his termination for lying on his employment application about a prior felony conviction. *Id.* at 535, 105 S.Ct. at 1489–90. The Supreme Court said:

> The need for some form of pretermination hearing, recognized in these cases, is evident from a balancing of the competing interests at stake. These are the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous deprivation. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

*Loudermill,* 470 U.S. at 542–43, 105 S.Ct. at 1493–94.

 By balancing these factors, the Court determined that Mr. Loudermill was denied due process by not being afforded a pretermination hearing because the government's interest in removing Mr. Loudermill did not outweigh the risk of the erroneous deprivation of his livelihood. In *dicta,* suggesting a way in which the government could avoid the due process concerns caused by the termination of dangerous employees, the Court said that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." *Loudermill,* 470 U.S. at 544–45, 105 S.Ct. at 1494–95 (footnote omitted).

 The *dicta* quoted above was merely a suggestion as to how to avoid constitutional problems—it was plainly not intended to mean that if an employee posed no threat to safety, the employer could not similarly avoid constitutional problems by suspending the employee with pay. This was made plain in *Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120 (1997), when the Court said that it "ha[s] not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." We have been referred to no case, and have found none, where a court has interpreted *Loudermill* in the manner suggested by the trial judge.

[A] person's right to due process does not turn on monetary loss.... For Rowe, a 24–year fire department veteran, exclusion from work for two months was more than a *de minimis* deprivation. Rowe had a strong interest in not being suspended, particularly when it implicated him as part of a widely publicized sex scandal which damaged his reputation. Though Rowe did not lose any monetary benefits during his suspension, he still suffered a deprivation. Rowe's two-month separation was a greater deprivation than that suffered by public employees in other cases where courts held that some due process was required. *See, e.g., Garraghty[ v. Jordan]*, 830 F.2d [1295,] 1299 [ (4th Cir. 1987) ] (five-day suspension without pay is not *de minimis* ); *Boals v. Gray,* 775 F.2d 686 (6th Cir.1985) (five-day suspension is not *de minimis* ); *Goss[ v. Lopez]*, 419 U.S. [565,] 576, 95 S.Ct. 729, 42 L.Ed.2d 725 [ (1975) ] (a student's 10–day suspension from school is not *de minimis* ).

(Footnotes omitted.)

██ *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), involved the suspension of a high school student and is not at all analogous to a situation involving a permanent status employee receiving full salary and benefits pending termination. In *Goss,* a group of high school students from several high schools in the Columbus, Ohio, Public School System (CPSS) were suspended for various types of misconduct. Ohio law provided that a principal could suspend for up to 10 days or expel a student so long as the student's parents were notified within 24 hours. If the student was *expelled,* the student (or his parents) could appeal the decision, but a similar appeals procedure was not provided for students who were merely *suspended.* As a result, the suspended students brought a class action against the CPSS alleging, *inter alia,*[13]

---

**13.** The students also claimed liberty interest violations. A student may have a liberty interest in his tarnished reputation as a result of his suspension, *Goss,* 419 U.S. at 574, [95 S.Ct. at 736], but injury to reputation alone is not sufficient to give rise to a cause of action under

that the school system's failure to provide them with a hearing violated their Fourteenth Amendment property rights.

As a threshold issue, the Court noted that although "there is no constitutional right to an education at public expense," *id.* at 572, 95 S.Ct. at 735, the State of Ohio had by statute created a property interest in a free education for residents between 5 and 21 years of age. *Id.* at 573, 95 S.Ct. at 735. And although CPSS principals had the authority to suspend students for up to 10 days, they could only do so "for cause." Thus, the Court said, "[h]aving chosen to extend the right to an education to [the students] generally, Ohio may not withdraw that right on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred." *Id.* at 574, 95 S.Ct. at 736. In regard to the nature of the property interest involved, the Court said that "[t]he student's interest is to avoid unfair or mistaken exclusion from the educational process." *Id.* at 579, 95 S.Ct. at 739.

Recognizing that "[s]ome modicum of discipline and order is essential if the educational function is to be performed," *id.* at 580, 95 S.Ct. at 739, the Court noted that "*some* kind of notice and ... *some* kind of hearing" would not jeopardize the schools' orderly administration. *Id.* at 579, 95 S.Ct. at 738. Accordingly, the Court held that "due process requires ... that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740. "[A]s a

---

42 U.S.C. § 1983. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court said:

> The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

*Id.* at 701, [96 S.Ct. at 1160–61].

general rule notice and hearing should precede removal of the student from school." *Id.* at 582, 95 S.Ct. at 740.

The Rowes agree with the trial judge that a person's right to due process does not turn on monetary loss and argue that Lt. Rowe had a property interest in his reputation and his desire to practice his occupation as a firefighter for those two months that he continued to receive his full salary and benefits. Specifically, appellees argue:

> [D]ue process rights for those facing a deprivation of their property and/or liberty interests do not hinge on receipt of monetary benefits. *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975) (students suspended for 10 days without a hearing); *Wolff v. McDonnell,* 418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974–2975, 41 L.Ed.2d 935 (1974) (prisoners facing loss of good-time credit); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole).

It is true that property interests do not hinge on monetary benefits in every case because *in every case* the primary benefit conveyed is not always a monetary benefit. A student who is improperly deprived of his right to attend class suffers no earning loss. A student's property interest is his or her opportunity to sit in the classroom and learn, i.e., to be included in the "educational process" of which the Court spoke in *Goss. Goss,* 419 U.S. at 579, 95 S.Ct. at 738. In *Goss,* the Court said: "Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated,[14] is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." *Id.* at 576, 95 S.Ct. at 737.

In finding that Lt. Rowe was deprived of a property interest, another case relied upon by the court was *Wolff v.*

---

**14.** While a student's liberty interest in his or her good reputation may be "implicated" by a suspension from school, damage to reputation alone is not sufficient to sustain a section 1983 claim. *Paul v. Davis,* 424 U.S. at 701,[ 96 S.Ct. at 1160–61].

*McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Wolff* involved a claim by a Nebraska prisoner that he had improperly been denied "good time" credits. Prisoners improperly denied good time credits are deprived of a *liberty interest,* and not a property interest, protected under the Due Process Clause. As the Court stated in *Wolff:*

> Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff,* 418 U.S. at 557, 94 S.Ct. at 2975.

Finally, *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), dealt with the alleged deprivation of a liberty interest, i.e., the revocation of parole without a hearing. *See id.* at 481–82, 92 S.Ct. at 2600–01. As already mentioned, here the trial court found that Lt. Rowe's liberty interests were not violated by the City. Thus, *Goss* and *Morrissey,* the cases relied upon by appellees and the lower court, are plainly inapposite. On the other hand, a number of cases support the City's position that in cases such as the one *sub judice,* in order for an employee (who has been suspended from work without a hearing) to show deprivation of a property interest protected by the Due Process Clause, that employee must prove some monetary loss.

In *Swick v. City of Chicago,* 11 F.3d 85, 87 (7th Cir.1993), the Seventh Circuit declined to extend *Goss*'s holding to a

situation involving non-students. Ronald Swick, a veteran police officer, was placed on involuntary sick leave due to psychological problems for a period of more than one year. *Id.* at 86. Although he received no salary during that period, his income was not diminished because the amount of money that he received as "sick pay" was equal to that of his regular salary. *Id.* During this period, however, Swick was forced to turn in his badge and gun and was forbidden to wear his uniform or perform any official police duties. *Id.* He filed suit against the City of Chicago alleging that he was denied due process of law when he was placed on involuntary sick leave without a hearing. *Id.*

In rejecting Swick's claim that his property interests were violated because he was denied the right to perform his duties as a police officer, the court said:

> We do not think that "property" within the sense of the amendment should be extended to the purely dignitary or otherwise nonpecuniary dimensions of employment. . . .
>
> . . . The constitutionalization of public employment is controversial even when limited to protecting the economic dimensions of employment. It should not be extended beyond harms having measurable economic value, harms that may include however a loss of pecuniary benefits not limited to wages or other compensation.
>
> We do not think the case can be compared to *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), where a ten-day suspension from school was held to be an actionable deprivation of liberty [and property]. *Children are not compensated when they are suspended.*

*Id.* at 87 (emphasis added).

In *Royster v. Board of Trustees*, 774 F.2d 618 (4th Cir.1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986), the appellant was the superintendent of the school district and was employed under a series of multi-year contracts that were periodically renewed or extended. *Id.* at 619. On January 11, 1983, the school board voted not to extend appellant's contract, which was to expire on June 30, 1983.

Moreover, without explanation, the board informed appellant that his services were no longer required as superintendent but that he would be fully compensated through the end of his contract. *Id.* at 619–20. Appellant filed suit arguing, among other things, that his due process rights were violated by not being afforded "adequate notice of the reasons [for his dismissal] and a fair opportunity to respond to them." *Id.* at 620.

> The sole issue before the Fourth Circuit was whether Royster's property interest, i.e., the legitimate expectancy in continued employment, included not only the right to receive the compensation guaranteed under the contract but also the right to actively engage in and execute the duties of his office.

*Id.* at 621. The Court held that "any constitutionally protected property interest Royster had as a result of his employment contract has been satisfied by payment of the full compensation due under the contract." *Id.*

More recently, the Fourth Circuit reiterated this holding stating:

> [W]e have previously held that the constitutionally protected property interest in employment does not extend to the right to possess and retain a particular job or to perform particular services. *See Huang v. Board of Governors,* 902 F.2d 1134 (4th Cir.1990); *Royster v. Board of Trustees,* 774 F.2d 618, 621 (4th Cir.1985). Rather, the property interest is more generally in continued employment, and *no deprivation exists so long as the employee receives "payment of the full compensation due under the contract." Royster,* 774 F.2d at 621.

*Fields v. Durham,* 909 F.2d 94, 98 (4th Cir.1990) (emphasis added), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991); *see also Durham v. Fields,* 87 Md.App. 1, 19, 588 A.2d 352 ("[W]e agree with the conclusions of the Fourth Circuit Court of Appeals [*Fields v. Durham, supra,*] and therefore hold that, upon consideration of both the pre- and post-deprivation procedures and remedies afforded to Dr. Fields, there was no Constitutional deprivation under articles

19 or 24 of the Declaration of Rights."), *cert. denied,* 323 Md. 308, 593 A.2d 668 (1991); *Harris v. Board of Educ.,* 105 F.3d 591, 596 (11th Cir.1997) ("[A] public official has a constitutionally protected property interest only in the economic benefits of his position...."); *Harrington v. Lauer,* 888 F.Supp. 616, 620 (D.N.J.1995) (holding that although appellant "had a protected property interest in the right to receive the full amount of compensation provided for in his contract, he did not have a protected property interest in the right to execute his duties as superintendent for the duration of his contract").

A large number of other federal and state courts have also held that a suspended employee's due process rights are not implicated so long as he or she continues to receive pay and benefits. *See Pitts v. Board of Educ.,* 869 F.2d 555, 556 (10th Cir.1989) (holding that a "suspension with pay [does] not invade any recognized property interest"); *see also Hicks v. City of Watonga,* 942 F.2d 737, 746 (10th Cir.1991) (same); *Wasson v. Sonoma County Junior College Dist.,* 4 F.Supp.2d 893, 906 (N.D.Cal.1997) ("Wasson, by acknowledging that she was placed on paid administrative leave, cannot claim that she was deprived of a property interest in her employment, as a matter of law."); *Koelsch v. Town of Amesbury,* 851 F.Supp. 497, 500 (D.Mass.1994) ("A public employee's suspension with pay does not implicate a constitutionally protected property interest."); *Pierce v. Engle,* 726 F.Supp. 1231, 1237 (D.Kan. 1989) (holding that a school principal's suspension with pay did not implicate a constitutionally protected property interest); *Gates v. Sicaras,* 706 F.Supp. 169, 172–73 (D.Conn.1989) ("Plaintiff fails, however, to offer any evidence pointing to a claim of entitlement to such benefits of employment beyond his regular salary."); *Hunt v. Prior,* 236 Conn. 421, 673 A.2d 514, 524 (1996) (holding that a suspension with pay did not carry constitutional ramifications because plaintiff did not prove that he was entitled to anything but his salary); *Board of Educ. v. Harrell,* 118 N.M. 470, 882 P.2d 511, 518–19 (1994) (holding that a suspension with pay does not violate any recognized property interest).

**292**

 Based on the holdings in the above cited cases, Lt. Rowe had no constitutionally protected property interest in actually performing his job; nor were his due process rights violated so long as he continued to receive pay and benefits. We believe these cases are based on solid reasoning. Thus, we join the Fourth Circuit and the large number of other federal and state courts that have held that an employee has a protected property interest only in the economic benefits of his or her employment and that an employee's property interest in his continued employment is properly safeguarded by payment of full salary and fringe benefits during his suspension. Because he was not deprived of a property interest, Lt. Rowe suffered no state or federal constitutional violation. The trial court erred in finding in favor of Lt. Rowe as to Counts I and II, and in favor of Lt. Rowe and his wife as to Count VI.

**JUDGMENT REVERSED;**

**COSTS TO BE PAID BY APPELLEES.**