**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 06-1360**

---

PHYLLIS M. BRASWELL, Administrator of the
Estate of W. Kelley Braswell, M.D.,

                              Plaintiff - Appellant,

        versus

HAYWOOD REGIONAL MEDICAL CENTER,

                              Defendant - Appellee,

        and

HARRY LIPHAM, M.D.; ERIC REITZ, M.D.; DEBERA
HUDERLY, M.D.; LUIS MUNOZ, M.D.; DAVID
PETERSON, M.D.; CHRISTOPHER WENZEL, M.D.;
RICHARD STEELE, M.D.,

                              Defendants.

---

Appeal from the United States District Court for the Western
District of North Carolina, at Asheville. Lacy H. Thornburg,
District Judge. (1:04-cv-00092)

---

Argued: February 2, 2007          Decided: April 26, 2007

---

Before WIDENER, MICHAEL, and KING, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** John Boling Meuser, Raleigh, North Carolina, for Appellant.
William Carleton Metcalf, Philip J. Smith, VAN WINKLE, BUCK, WALL,

STARNES & DAVIS, P.A., Asheville, North Carolina, for Appellee. **ON BRIEF:** Allison Serafin, LAW OFFICES OF JOHN MEUSER, P.A., Raleigh, North Carolina, for Appellant. Carolyn L. Coward, VAN WINKLE, BUCK, WALL, STARNES & DAVIS, P.A., Asheville, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

W. Kelley Braswell, M.D. (now deceased) filed this suit against the state-owned Haywood Regional Medical Center (the Hospital) and seven individual doctors after the Hospital suspended his medical privileges in 2003. (Although the administrator of Braswell's estate has been substituted as the plaintiff-appellant, we will, for sake of clarity, use Braswell's name throughout this opinion.) Braswell, who had medical privileges at the Hospital, alleges that his privileges were revoked in retaliation for exercising his First Amendment rights and that the summary suspension of his privileges violated his due process and contractual rights. We affirm the district court's order granting summary judgment to the defendants. We treat Braswell as a public employee and conclude that his speech was not protected because the Hospital's duty to provide quality health care outweighed his interest in expressing concerns about the Hospital's efforts to recruit surgeons. Further, we conclude that the Hospital reasonably believed that quick action was necessary to protect patient safety, thus justifying the summary suspension of privileges.

I.

Because the district court granted the defendants' motion for summary judgment, we state the facts in the light most

favorable to the non-movant, Braswell, drawing all reasonable inferences in his favor. <u>Seabulk Offshore, Ltd. v. Am. Home Assurance Co.</u>, 377 F.3d 408, 418 (4th Cir. 2004). Braswell, a partner at the privately owned Midway Medical Center, was one of four surgeons in Haywood County, North Carolina. The other three general surgeons, Drs. Reitz, Sharpton, and Sufian, maintained separate practices but shared office space and expenses. All four surgeons had medical privileges at the Hospital, a state-owned facility, which permit them to perform operations at the Hospital's facilities. In return, the doctors must be on call for the Hospital, which requires them to be available at certain times to treat patients admitted to the emergency room. The doctors' relationship with the Hospital is governed by the Medical Staff Bylaws.

In 2000 Braswell recruited Dr. Dearl Birdsong, another general surgeon, to join Midway Medical. Haywood County's other three surgeons offered a position to Dr. Larry Herberholz. The Hospital, which had previously determined that the county could support 1.8 additional surgeons, facilitated these efforts by offering both candidates recruitment contracts. The contracts provided incentives (guaranteed income, relocation allowance, and education matching loan allowance) to encourage the doctors to practice in Haywood County.

4

In January 2001, before either of the candidates signed contracts with the Hospital, Braswell sent Herberholz a letter stating:

> I have some concerns about bringing two surgeons to this area at the same time. Counting outmigration we only have a county population of about 40,000. That is a pretty small group for 6 general surgeons to maintain an active practice.

J.A. 295. Braswell also sent a letter to the chairman of the Hospital's finance committee, which he enclosed with his letter to Herberholz. This letter repeated his concerns about bringing two additional surgeons to the county:

> I have polled a sample of the medical staff and none feel that 6 general surgeons are needed in this county. Of the 4 general surgeons who are currently in the county only one feels that 6 general surgeons are needed here. I think that we will be doing a significant disservice to both of these individuals if both are brought here. In addition this may represent a nearly half million-dollar blunder by the hospital in terms of [financial] guarantees which cannot be met.

J.A. 296. Herberholz subsequently accepted an offer outside of Haywood County.

The Hospital's Board of Commissioners (the Board) expressed its displeasure that Braswell sent the letter to Herberholz with the knowledge that the Hospital had decided to recruit two general surgeons. (Braswell was a member of the task force that determined that Haywood County could support 1.8 additional surgeons.) Several members of the Board told Braswell that "this type of conduct would sabotage [the Hospital's]

5

recruiting process if one practice could call a recruitment candidate of another practice and sway the candidate's placement decision." J.A. 301.

Braswell contends that the Hospital immediately started to retaliate against him. On February 22, 2001, the Board decided to "table further discussions" of its ongoing contract negotiations with Birdsong.* J.A. 300. According to Braswell, the three surgeons in the competing practice refused to assist him in surgery or to take calls for him when he had scheduling conflicts, and Dr. Lipham, the Hospital's Chief of Staff at the time, became "openly hostile." J.A. 17. In July 2000 the Board also denied Braswell's application for privileges to perform laparoscopic gastric bypass surgery, concluding that the procedure was too dangerous to be performed at the Hospital.

The first significant adverse employment action against Braswell occurred at the end of 2002. On December 2, 2002, Braswell performed a standard gastric bypass surgery on Patient F. The patient suffered severe post-operative complications, including renal failure, shock, and sepsis. Several doctors who consulted on the case determined that there was a risk of death and recommended that Braswell transfer the patient to a better-equipped facility.

---

*The Hospital, however, eventually voted to offer Birdsong a recruiting contract on April 26, 2001. Birdsong worked in Haywood County until mid-2003, although it is unclear which practice he was associated with. J.A. 273.

6

Braswell refused.  On December 14, Dr. Nancy Freeman, the Hospital's Chief of Staff confronted Braswell about Patient F and insisted that he transfer the patient.  Braswell "graced [Freeman] with some expletives" during the conversation.  J.A. 196.

As a result of Patient F's experience, Freeman placed a moratorium on all gastric bypass surgeries at the Hospital.  She also created the Gastric Ad Hoc Committee to review all gastric bypass surgeries performed over the past two years.  Six days later, before the Gastric Ad Hoc Committee completed its review of the past bypass surgeries, the Medical Executive Committee (MEC) voted to suspend indefinitely Braswell's privileges to perform the gastric bypass procedure.  The MEC decided to lift the general moratorium because the problem with gastric bypass surgeries was "physician specific."  J.A. 329.

On January 14, 2003, the Gastric Ad Hoc Committee presented its review of the gastric bypass surgeries over the past 18 months (3 surgeries by Sharpton and 19 by Braswell) to the MEC. The committee reported minor concerns with all of the surgeries. It also reported major concerns in eight of Braswell's surgeries and one of Sharpton's surgeries.  Braswell was not present for the committee's presentation, nor was he provided with a copy of its findings.  After the committee reported its findings, the MEC questioned Braswell about the surgeries.  It then voted unanimously to continue the suspension of Braswell's gastric bypass privileges.

7

The MEC also created the General Ad Hoc Committee to review Braswell's major surgical procedures in the upcoming months.

The General Ad Hoc Committee met with the MEC on May 6, 2003, to discuss its review of Braswell's major surgeries over the past three months. It reported concerns over Braswell's care of Patient H, who had been transferred to another hospital due to complications arising from a bowel surgery. The MEC decided to schedule a special meeting on May 27, 2003, to discuss the General Ad Hoc Committee's concerns.

Before the meeting could take place, however, the MEC voted to suspend summarily all of Braswell's surgical privileges. The vote was prompted by a letter sent by the Surgical Case Review Committee (SCRC), which had also reviewed Patient H's file. (The SCRC regularly reviews the files of patients who have unexpected complications with a surgical procedure.) The SCRC expressed the following concerns with Braswell's care of Patient H: (1) stool began to drain from the patient after the surgery; (2) Braswell did not respond in a timely manner to the Hospital staff's repeated attempts to notify him of Patient H's problems; (3) rather than taking Patient H immediately back to surgery, Braswell ordered a CT scan; and (4) Braswell refused to consult with Pulmonary or Internal Medicine despite requests by the attending nurses. The Hospital's President, David Rice, officially suspended Braswell's

privileges on May 21, 2003. Braswell did not have an opportunity to defend himself before the suspension went into effect.

The MEC met with Braswell a week later to discuss his care of Patient H. Braswell admitted that he should have taken the patient back to surgery but denied that the patient was ever in danger. The MEC stated that Braswell "appear[ed] not to understand the severity of the concerns in this case." J.A. 376. It also expressed concern that the "problems seen in this case were the same type of problems that had been addressed with Dr. Braswell at his prior meeting with the MEC." J.A. 377. The MEC unanimously voted to continue the suspension of Braswell's privileges.

Braswell then requested a Fair Hearing Committee to review the Hospital's decision. Braswell was represented by counsel at the hearing, which lasted approximately 20 hours over a three-day period in October and November 2003. Braswell's chief witness, Dr. Jesse Meredith, a professor of surgery at Wake Forest University, testified that the MEC's assessment of Braswell's performance was faulty. She stated, "I believe this is a situation in which people, committees, who are not knowledgeable about the issues at stake here, were asked to make judgment about the patients which [sic] were at stake here." J.A. 40-41. At the end of the hearing, the Hearing Committee concluded:

> [T]here [were] legitimate and serious concerns regarding Dr. Braswell's preoperative assessment and postoperative management of the cases presented during the hearing. . . .

9

> However, it appears to this committee that Dr. Braswell was not afforded ample opportunity to respond to the allegations made prior to the summary suspension. . . .
>
> The committee acknowledges that the MEC acted in good faith and with the intention of protecting patients, however, we are concerned by the apparent lack of appropriate documentation by the hospital as required by the bylaws.

J.A. 48. The report concluded that the "evidence did not support summary suspension, and that other avenues of corrective action . . . could have been investigated by the Medical Executive Committee prior to summary suspension." Id. Despite the Fair Hearing Committee's conclusion, the MEC again voted to continue the suspension of Braswell's privileges. The Appellate Review Committee affirmed the MEC's decision, which was adopted by the Hospital's Board.

Braswell then sued the Hospital and the seven members of the MEC in the United States District Court for the Western District of North Carolina. Braswell brought claims under 8 U.S.C. § 1983 for First Amendment retaliation and violations of his right to due process. He also brought state law claims for defamation, breach of contract, and tortious interference with contractual relations. The district court dismissed the tortious interference claim and later granted summary judgment to the defendants on the remaining claims. Braswell appeals the district court's grant of

10

summary judgment on his two § 1983 claims and his state law breach of contract claim.

We consider each of Braswell's three claims, beginning with the First Amendment retaliation claim. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Our review is de novo. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004) (en banc).

II.

Braswell claims that the Hospital, a state actor, violated his First Amendment rights by retaliating against him for expressing his concern to Herberholz that Haywood County could not support two new surgeons. Braswell contends that the decision to postpone contract negotiations with his recruit (Birdsong), the suspension of his gastric bypass privileges, and the termination of his surgical privileges were motivated by the Hospital's displeasure with his constitutionally protected speech.

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To establish a claim of First Amendment retaliation, a plaintiff must show that

11

(1) he engaged in protected First Amendment activity; (2) the defendant took action that adversely affected his First Amendment rights; and (3) there was a causal relationship between the protected speech and the adverse action. Id. at 686.

To decide whether Braswell's speech is protected, we must first determine whether Braswell is a public employee for purposes of the First Amendment. The government may impose certain restraints on the speech of its employees, and take action against employees for speaking on certain matters, that would be unconstitutional if applied to the general public. City of San Diego v. Roe, 543 U.S. 77, 80 (2004). This limited exception to the First Amendment's general prohibition on interference with speech exists because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions." Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006).

Braswell argues that as a partner of the privately owned Midway Medical Center, he is not a public employee. He received no remuneration from the Hospital and his only connection to the Hospital was his "privilege[] to admit patients and to perform certain medical procedures." Appellant's Br. at 19. These privileges, he asserts, do not make him a public employee.

The Supreme Court has rejected the agency law definition of "employee" that Braswell proposes. The government's legitimate

12

reasons for regulating its employees' speech apply equally to independent contractors. See Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 677-78 (1996). In Umbehr the Supreme Court explained: "The similarities between government employees and government contractors with respect to [the First Amendment] is obvious. The government needs to be free to terminate both employees and contractors . . . to improve the efficiency, efficacy, and responsiveness of service to the public." Id. at 674. Thus, the Court held that the "existing framework for government employee cases [should be applied] to independent contractors." Id. at 677.

Braswell, like all staff doctors, is essentially an independent contractor for the Hospital. See Smith v. Cleburne County Hosp., 870 F.2d 1375, 1381 (8th Cir. 1989) (stating that the relationship between staff doctors and hospitals has "similarities to that of an employer-employee relationship"); Caine v. Hardy, 943 F.2d 1406, 1415-16 (5th Cir. 1991) (treating staff doctor as employee for First Amendment analysis). Hospitals and staff doctors have reciprocal obligations. In return for the privilege to use the Hospital's facilities, staff doctors are required to be on call for certain periods each month and help with various administrative functions. Staff doctors consult with other doctors and assist in performing surgeries, and hospitals may be held jointly and severally liable for their tortious conduct. See Smith, 870 F.2d at 1381. Indeed, a patient admitted to the

13

emergency room would not know the difference between staff doctors and doctors on the hospital payroll. Thus, because Braswell is similar to an independent contractor, we must treat him as a public employee in analyzing his First Amendment claim. See Umbehr, 518 U.S. at 677.

When a public employee speaks "as a citizen upon matters of public concern," Connick v. Myers, 461 U.S. 138, 147 (1983), we must balance "the interests of the [employee] . . . and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); see also Garcetti, 126 S. Ct. at 1958 (stating that employees "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively"). After conducting this balancing, we agree with the district court that Braswell's letter was not protected speech. Although Braswell has an interest in expressing concerns about the manner in which the state-owned hospital operates, the Hospital has a greater interest in regulating speech that interferes with its core mission. To meet the medical needs of Haywood County, the Hospital, like all hospitals in more sparsely populated areas, must devote extra effort to recruiting physicians. Accordingly, the Hospital has a significant interest in preventing staff doctors from interfering with the Hospital's recruiting efforts. The Hospital also has an

14

important interest in maintaining a collegial atmosphere. As stated above, doctors must frequently consult with each other and assist in performing surgeries. Braswell's actions negatively affected his relationship with his colleagues and thus impacted his ability to provide quality care to patients at the Hospital. See Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006) (considering whether employee's speech "impaired harmony among coworkers" or "damaged close personal relationships").

For all of these reasons, we conclude that Braswell's letter was not protected speech. Therefore, Braswell cannot establish a claim of First Amendment retaliation. See Suarez, 202 F.3d at 686.

III.

Braswell argues that the Hospital violated his due process rights when it summarily suspended his privileges to perform gastric bypass surgeries in December 2002 and his remaining surgical privileges in May 2003. He states that the Hospital was constitutionally required to provide him notice of the allegations, and an opportunity to defend himself, before suspending his medical privileges. Because Braswell does not argue that the post-deprivation procedures were insufficient, we must only decide whether a pre-deprivation hearing was constitutionally required under the circumstances.

15

"Due process is flexible and calls for such procedural protections as the particular situation demands." Gilbert v. Homar, 520 U.S. 924, 930 (1997). Although due process generally requires an opportunity to be heard prior to the deprivation of a property interest, Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985), it is well established that a pre-deprivation hearing is not required in all circumstances. See North Am. Cold Storage Co. v. City of Chicago, 211 U.S. 306 (1908) (confiscating potentially contaminated food without hearing); Gilbert, 520 U.S. 924 (suspending police officer who was arrested on drug charges). "[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." Gilbert, 520 U.S. at 930. Thus, the Hospital did not violate Braswell's constitutional rights if the summary suspension of his privileges was necessary to protect patient safety. See Patel v. Midland Mem. Hosp. & Med. Cen., 298 F.3d 333, 340 (5th Cir. 2002) (holding that summary suspension of cardiologist's clinical privileges did not violate due process because doctor's "methods posed a danger to patient safety"); Caine, 943 F.2d at 1412-15 (holding that suspension of anesthesiologist's clinical privileges before formal hearing was held was constitutional).

In the present case, the Hospital had good reason to conclude that quick action was necessary to protect patient safety.

16

The MEC suspended Braswell's gastric bypass surgeries after Braswell's patient, Patient F, was transferred to another hospital in critical condition. The Chief of Staff's (Freeman's) investigation of the incident revealed that Patient F suffered renal failure, shock, and sepsis after the operation; Braswell refused to transfer the patient to a better equipped facility despite the patient's deteriorating condition and requests by other physicians; and Braswell took the patient back into surgery without the aid of surgical assistants. In addition to these clinical errors, Braswell showed poor judgment by cursing at Freeman when she ordered the patient transferred to another facility.

The second deprivation occurred in May 2003 when the Hospital revoked all of Braswell's surgical privileges. Again, the Hospital had sufficient reason to believe that this action was necessary to protect the public. A review of Braswell's gastric bypass surgeries showed numerous deficiencies in his standard of care, including several failures to staple properly the patient's stomach, two failures to conduct a pregnancy test prior to the operation, and "innumerable documentation failures." J.A. 354. The General Ad Hoc Committee also reported a continued pattern of poor documentation and serious problems with Braswell's pre- and post-operation care, which resulted in one patient being transferred to another hospital in critical condition. Finally, the SCRC stated that there was "an extremely disturbing trend of

17

young, otherwise healthy patients going very badly post operatively with nurses being unable to locate Dr. Braswell." J.A. 36. The SCRC added, "We have already seen too many otherwise healthy individuals that have come through the committee that have had near life threatening complications when treated by Dr. Braswell and inappropriate recognition and care." J.A. 37.

We conclude that the MEC, based on the information before it, had reasonable grounds for suspending Braswell's privileges without first providing him an opportunity to be heard. Accordingly, there was no due process violation.


IV.

For similar reasons, we reject Braswell's claim that the Hospital breached its contract by failing to follow the privilege suspension procedures set forth in the bylaws. Because the Hospital's decision is protected by immunity under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101 et seq., Braswell cannot succeed on his breach of contract claim.

The HCQIA provides immunity for "professional review actions," see § 11111(a), that are taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures . . . or after such other procedures as are fair to the

18

physician under the circumstances, and

> (4) in the reasonable belief that action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

Id. § 11112(a). The HCQIA also creates a presumption that action taken by a professional review committee meets these criteria. Id. § 11112(a)(4). Braswell cannot overcome this presumption. First, the Hospital believed that it was acting in furtherance of quality health care. As the Fair Hearing Committee stated, there were "legitimate and serious concerns" about Braswell's care, and the MEC acted in "good faith and with the intention of protecting patients." J.A. 48. Second, the Hospital made a reasonable effort to obtain relevant information. It created committees to review Braswell's gastric bypass surgeries and, subsequently, all of his major surgical procedures. Braswell's treatment of Patient F was also reviewed by the Surgical Case Review Committee. Finally, as we described in part III, the procedures provided to Braswell were fair under the circumstances, and the Hospital acted with the reasonable belief that quick action was necessary to protect the safety of the patients.

V.

For the foregoing reasons, we affirm the district court's order granting summary judgment to the defendants.

<u>AFFIRMED</u>

19